(No. 20712.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* RICHARD SULLIVAN *et al.* Plaintiffs in Error.

*Opinion filed June 18, 1931—Rehearing denied October 8, 1931.*

BENJAMIN C. BACHRACH, WILBERT F. CROWLEY, and WENDELL E. GREEN, for plaintiff in error Frank Bell; DAVID RISKIND, and HERBERT GEISLER, for plaintiff in error Richard Sullivan.

OSCAR E. CARLSTROM, Attorney General, JOHN A. SWANSON, State's Attorney, and J. J. NEIGER, (EDWARD E. WILSON, and GRENVILLE BEARDSLEY, of counsel,) for the People.

Mr. Justice Dunn delivered the opinion of the court:

Richard Sullivan and Frank Bell were convicted in the criminal court of Cook county of murder, were sentenced to death and have sued out a writ of error.

The crime was committed a few minutes after two o'clock in the morning of June 16, 1930. The place was the Villa Rica restaurant, at the southwest corner of Wrightwood avenue and Clark street, in the city of Chicago, of which Christ Patras was the manager. He was shot there by both of the defendants acting together; receiving four gunshot wounds in his body, from which he died. A diagram of the room appears in the record but a detailed description of it is not necessary. The width of the room fronted east on Clark street and its length extended back west on Wrightwood avenue. The entrance was at the northeast corner through a door placed diagonally so as to front on both Clark street and Wrightwood avenue. On the south side of the room was a lunch counter, between which and the south wall was an aisle used by the employees serving at the lunch counter, a cigar case and cash register, and south of the aisle were coffee urns, an ice-box and a pie showcase. The lunch counter was divided into two sections, the shorter at the west end having seven stools in front and the longer one at the east, nine. The lunch counter did not reach to the east wall of the room but stopped a few feet short. A cigar case occupied the space east of the lunch counter to the wall, except a narrow space or aisle between the west end of the case and the east end of the lunch counter. In the southeast corner of the room, south of the cigar case, was a cigarette case and west of it a radio, which was next to the pie showcase, south of and across the aisle from the lunch counter. There was a safe behind the cigar case, under the radio or cigarette case, and under the lunch counter were shelves accessible to the service aisle, on one of which, opposite the first counter stool, was a loaded .45-caliber revolver. The aisle continued to the east end of the room,

having the radio and the cigarette case south of it, the cigar case north of it and connecting with the aisle between the cigar case and the lunch counter.

The two defendants came into the restaurant about two o'clock in the morning, occupied the first two stools at the east end of the lunch counter and ordered coffee. Then they ordered a second cup. When they came in Patras was sitting in a booth further back in the room with his wife. Presently he arose and went back to the kitchen to get her some food. A few minutes later he came out of the kitchen and walked east back of the lunch counter toward the cigar case and the cash register, which stood on it. As he walked toward the cigar case the two men got up off the stools near the cigar case as though about to pay their checks. One of them went behind the counter and met Patras walking toward him, facing east. Patras stooped, and as he rose both he and the other man were firing. Patras shot only once. The bullet passed through the sliding door of the cigar case and was found lying in that case. He had used the revolver lying under the lunch counter and the bullet probably hit Sullivan in the hip before it passed through the sliding door of the cigar case, as Sullivan had such a wound when he was arrested on July 22. Several other shots were fired in rapid succession. Bell ran out of the door and Sullivan came from the cigar counter with a revolver in his hand, which he was waving. He backed out with the revolver in his hand until he reached the vestibule and then he disappeared. Patras was lying behind the cigar case on his face, with his head to the east. A post-mortem examination disclosed four bullet wounds, apparently made by bullets of .38 caliber. One had entered the left side of the neck just back of the jawbone and emerged on the right side just below the jaw. Another entered the left chest, just over the fifth rib, passed through the lung and emerged just below the shoulder blade. The third entered the middle portion of the left arm, passed through the arm and

shoulder and emerged on the inner side at about the same level. The fourth was a grazing superficial wound across the left breast. Death was due to hemorrhage. from the gunshot wound of the heart. The course of the bullets indicated that the bullet which resulted in death came from in front of Patras and two other bullets came from his left side. The bullet which came from the left and passed through his neck must have resulted in his disablement. The course of the bullets shows that besides the revolver of Patras two others were in use, one fired from in front of Patras, from which the bullet was fired which caused the fatal wound, and the other from his left side, bullets from which struck him in the neck and the left arm and also struck the dial of the radio. The men engaged were the two men who had sat on the two stools at the Clark street end of the lunch counter, one of whom went behind the counter and was in front of Patras, and the other was to the left of Patras across the counter. The evidence left by the bullets showed beyond any doubt that both men engaged in the shooting.

Sullivan was positively identified by Cecelia Patras, the widow, and by Elda Hubrick. The identification of Bell by the witnesses was not positive, but after his arrest he made a voluntary statement wherein he said that he was one of the men. In this statement he attributed all the shooting at Patras to Sullivan, and explained the purpose of his presence and Sullivan's at the restaurant to be the division of $10,000 which Patras had and which was to be divided, $1000 to Bell, $3000 to one Traum, $3000 to Traum's pal and $3000 to Sullivan, for their part in some other crime. When the statement was read to the jury the words "the other man" were substituted for "Sullivan," so that the jury might not receive the statement as evidence against Sullivan. In the statement, also, Bell said that Traum did not go into the restaurant but waited outside in the automobile and kept its engine going. The testimony of John Lane, who had

eaten at the lunch counter and had left a very short time before the shooting and who after the shooting saw the two men run from the restaurant and enter a parked automobile, tends strongly to show that the engine of the car was not running and that one of the men got into the driver's seat and used the starter to start the car. Verne Adams had also eaten at the counter and left the restaurant only a few minutes before the murder, and he, too, saw the men run to the parked car, but neither he nor Lane was able to identify the two men who were seated at the east end of the counter or the men who ran to the car after the shooting. The self-serving statements, partly shown to be false, made by Bell in his statement do not weaken in any degree his statement that he was one of the two men present when Patras was killed or the force of the circumstantial evidence of the course of the bullets then fired. The evidence thus showed without any doubt that both Bell and Sullivan were engaged in the shooting which resulted in Patras' death. Neither testified upon the trial and they offered no evidence. It thus appeared, without explanation of the circumstances, that Bell and Sullivan shot Patras, who died as the result of a wound then inflicted. Patras was in his usual place of business. One of the men was out of the place reserved for customers. He was nearer the safe than was Patras. The safe door was open immediately after the shooting. The circumstances indicated that Bell and Sullivan were engaged in a hold-up, during the course of which Patras resisted and they killed him. Apart from any other cumulative evidence in the case the jury could have done no less than find the defendants guilty of murder.

The defendants were represented in the trial, and are represented here, by different counsel and have filed separate briefs. The objection is made by Bell that all of the evidence fails to establish his guilt, but the evidence to which we have referred is uncontroverted, and, as we have seen, it does establish his guilt so thoroughly that no error which

may have occurred on the trial could have affected him injuriously unless its logical tendency were to cause the jury to impose a more severe penalty than they might have done except for the error.

Bell was arrested on June 30, 1930, by Howard J. Doyle, a police officer, in company with other police officers, at 1214 North Paulina street. A revolver was found near him in the room where he was arrested, which he admitted belonged to him. The court permitted the People to show the circumstances of the arrest, and the revolver was admitted in evidence over an objection upon the undertaking of the State's attorney to connect it with the crime. Doyle testified that Bell was lying on a davenport on which two women were sitting. He was searched, as well as the room, and a .38-caliber blue-steel Colt pistol was found behind a cushion of the davenport, within arm's reach of Bell. At the detective bureau, about fifteen or twenty minutes later, Bell, in answer to a question, said that the pistol was his. The People failed to show that the pistol had been used in the killing of Patras though an attempt in good faith was made to do so. In addition to the .45-caliber bullet which was found in the cigar case and identified by the ballistic expert, Wiard, as having been fired from Patras' revolver, three other bullets, all of .38-caliber, were found. One of them dropped out of Patras' clothing as his body was being undressed at the morgue. The other two were picked up by police officers back of the cigar case at the restaurant a few minutes after the homicide. These three bullets of .38-caliber, together with the pistol which was found upon the arrest of Bell, were submitted to Wiard, the ballistic expert, for examination. He testified that he fired two test bullets from the revolver into cotton waste, from which he recovered them. He then compared the two test bullets with the three which had been recovered as incidents of the investigation of the homicide. The comparisons were significant but not positive. They disclosed that the three bul-

lets might have been fired from the gun and it was possible that they had not been. This evidence failed to show that the pistol was used in the killing of Patras. It was not error, however, to permit the People to show that Bell owned a pistol of .38 caliber which might have been used in the commission of the crime, in view of the evidence which showed beyond any doubt that Bell was present and did fire bullets of .38 caliber at Patras at the time he was killed.

Counsel for Bell cite *People* v. *McGeoghegan,* 325 Ill. 337, as authority that it was error to permit the State to show the circumstances of his arrest and the finding of a pistol owned by him and to admit the weapon in evidence. In that case the evidence connecting the defendant with the crime was unsatisfactory when considered in connection with credibile evidence showing an alibi. The defendant was arrested about a month after the crime was charged to have been committed and at the time was carrying two .45-caliber revolvers. The man whom he was charged to have murdered was killed with a .38-caliber bullet, and there was not the slightest connection made between the two .45-caliber revolvers and the murder. "It is competent to prove that an accused person, when arrested, possessed a weapon suitable for the commission of the crime charged against him, even though no claim is made that he actually used it in committing the particular crime." *People* v. *Lenhardt,* 340 Ill. 538; *People* v. *Powloski,* 311 id. 284.

It is argued that counsel for the People, in the closing argument to the jury, made improper and highly prejudicial remarks, for which a new trial should be granted because of their tendency to cause the jury to impose the extreme penalty. The language complained of was as follows: "Gentlemen, give this case all the time that you think it needs. Consider every possible angle of it. Give to the defendants everything that they are entitled to by law, but while you are doing so remember this: that Laird wants

nothing from you; Butler wants less than that; but the People of the State of Illinois, the county of Cook and the city of Chicago want even-handed justice, and they want it in the form of a death penalty for Bell and a death penalty for Sullivan." Butler and Laird were the assistant State's attorneys engaged in the trial. Counsel for Bell rely upon *People* v. *Dabney*, 315 Ill. 320, as authority that the judgment ought to be reversed. The conviction in that case was of assault with intent to murder. The language objected to was: "I say to you men in all sincerity, in all frankness and honor, that the honor and the morality of Mason county is at stake in this one case; and I want to say to you gentlemen of the jury that there are going to be thousands of people in this county that are anxiously waiting for a verdict of your unbiased judgment on this evidence, of guilty." It was held that the statement was clearly error and in a case close on the facts would be sufficient to reverse the judgment. The jury were required to try the case according to the law and the evidence, and what the people of the community might want in the matter had nothing to do with their duty in the case. The State's attorney had no right to inject into the case, by argument, any inference that the public were anxiously awaiting a verdict of guilty. It was held, however, in that case, that it could not be said that but for such statement the verdict might have been otherwise; that the testimony presented in the case showed the guilt of the plaintiff in error, and the error was not sufficient to cause a reversal of the judgment. The evidence in the present case, as we have seen, showed that Bell was guilty of the murder charged against him, and the jury could not reasonably have rendered any other verdict than guilty. It was also the duty of the jury to fix the penalty from a consideration of all the circumstances, including the heinousness, atrocity and cruelty of the crime, and the State's attorneys were clearly within the limits of propriety in arguing that the death penalty should

be inflicted. It was not improper to invoke that penalty in the name of the People of the State of Illinois, whom the attorneys represented. The desire of the people for a particular verdict was not an element which the jury could consider in making their verdict. The argument of the counsel was that the people wanted even-handed justice and that even-handed justice demanded the death penalty. In this case the argument complained of does not require or justify a reversal of the judgment.

Counsel for Bell argue that the evidence is not sufficient to establish his guilt. He was present with Sullivan at the commission of the crime and fled with him from the scene. Four .38-caliber bullets were fired into Patras' body. One shot was fired by Sullivan, who was directly in front of Patras, and went directly through his body, front to back, entering the left breast over the fifth rib and emerging just below the shoulder blade. Another shot came from the north—the left side of Patras—and entered the left side of the neck just back of the jawbone, emerging on the right side just below the jaw. A third shot entered the middle portion of the left arm, passed through the arm and shoulder and emerged on the inner side at about the same level. The remaining shot caused a grazing superficial wound across the left breast. Bell was the only person present in a position from which these shots could be fired. The ballistic expert, as a result of his experiments with Bell's .38 police special model Colt revolver, found that the comparisons were significant but not decisive and that the .38-caliber bullets fired at Patras could have been fired from Bell's revolver but it was possible that they were not. Bell's statement made to Anderson, a police officer, was introduced in evidence by the prosecution. It was not a confession but was intended to exculpate him from criminal responsibility. He said that he went with Sullivan on the night of June 15 to the Villa Rica restaurant. They sat down at the counter on the first two stools, Sullivan on the first and Bell on

the second. Bell looked around and could not see Patras and he ordered a cup of coffee. Patras came out of the kitchen and finally came up to the cash register. Sullivan said to him, "We came to get that dough," and Patras turned around and went over to the safe, turned the combination and opened it. Sullivan went around to the back of the counter and stooped to pick up the money. Patras reached over and got a gun from under the counter and fired, Bell thought, two shots at Sullivan. Sullivan backed up, got his gun out and shot Patras, and Bell turned around and went out the door, Sullivan after him. They ran to a car which they had waiting with motor running and Joe Traum at the wheel and got away. Bell said: "The reason we went up to the restaurant that night was to get $10,000, of which I was to get $1000, Traum $3000, Traum's pal $3000 and the other man $3000. I was to get a share of the money for my part in the job done on June 9, 1930, which must have been the killing of Jake Lingle. I do not know for sure." Thus Bell admits his presence at the time Patras was killed without admitting that he joined in the shooting, but the evidence shows that the shots which went through Patras' body from left to right were fired from the spot where Bell stood. Whatever may have been his motive in going with Sullivan to the restaurant, he there intentionally joined in the assassination of Patras and was guilty of murder.

Sullivan also made a statement, in which he said that about midnight, or a little after, he went with Bell to the Villa Rica restaurant, and after sitting a few minutes in their car they went into the restaurant and ordered a cup of coffee and then another. They were waiting for Patras to come to the front where the safe was. As he came to the front near where the safe was the two left their stools. Sullivan went up to Patras and told him to keep his hands down and not say anything and nobody would be hurt. Patras turned around, and when he saw the gun he said, "All right." Sullivan told him to open the safe, and he said,

"All right." After he opened the safe Sullivan told him to step to one side and told Bell to keep his eye on him. Sullivan stooped down to take the money out of the safe, and as he did so he saw Patras with a gun in his hand. Sullivan got up from back of the safe door and told Patras to drop his gun, but he pulled the trigger and fired at Sullivan and hit him in the right hip. Then Sullivan said he pulled his gun out and shot, Patras returning the fire. Then Bell ran out to get the car started and Sullivan ran out soon after. On the same day, Monday, June 16, he saw in the paper that Patras was dead. The revolver with which he did the shooting he threw away on the outer drive, near Monroe street.

Objection was made by Sullivan to the admission of this confession on the ground that it was not voluntarily made, and there was a preliminary hearing before the judge, out of the presence of the jury, at which Sullivan testified that he was beaten by Sergeant Anderson to induce him to confess; that Chief of Detectives Norton asked him if he wanted to make a statement, and he refused; that Norton, having papers in his hand, read to his stenographer, and at the same time the stenographer would write down everything that he said, and at the end Norton asked Sullivan to sign it, and he refused because he had not made the statement, and Norton told him then that if he did not sign it he would be given the same treatment by Anderson as he had been given before, and later on Anderson came at him again and hit him, and rather than get beaten up again he put his signature to the paper, and that Norton promised, if he would confess, to guarantee him that he would get a life sentence or fourteen years, if Norton could give it to him. Those who were present at the time the statement was made were Norton, Anderson, officer Walsh and the stenographer. Sullivan stated that Sergeants Donohue and Reynolds witnessed the making of this statement, but Norton, Anderson and Walsh testified that those present at the writing and signing

of the statement were Sullivan and themselves, and Norton specifically states that officers Donohue and Reynolds were not present. They all denied the statements of Sullivan in regard to any beating, violence or promises. The objection to the statement was properly overruled.

Sullivan made a motion for a separate trial, which was denied, and it is insisted that this was erroneous. The grounds of the motion were that Bell, after his arrest, had made statements or confessions of guilt implicating Sullivan as an accomplice in the crime; that the evidence against Sullivan in respect thereto would be different in character and substance from that against Bell, and that Sullivan believed that if required to stand trial jointly with Bell he would be unduly prejudiced by the evidence which he believed would be produced against Bell, who had made sundry statements confessing that he was implicated in other murders; that Bell's statements had received considerable notoriety in the Chicago newspapers, and he was a notorious character, infamous and well known as a character of ill-repute. The State's attorney stated to the court that Bell had made a statement implicating Sullivan in the murder, and when it became necessary to read the statement to the jury the words "the other person" would be substituted wherever the name "Richard Sullivan" appeared in the statement. "The matter of granting a separate trial is within the discretion of the court and may not be assigned as error in the absence of an abuse of such discretion. (*People* v. *Sobzcak,* 286 Ill. 157; *People* v. *Covitz,* 262 id. 514; *People* v. *Gukouski,* 250 id. 231.) The general rule is that those indicted jointly for the commission of crime are to be tried together.—*Doyle* v. *People,* 147 Ill. 394." (*People* v. *Wood,* 306 Ill. 224.) "The rule is that confessions or admissions of one charged with crime in which a co-defendant is implicated are not competent as against the co-defendant but are competent, when properly restricted, as against the defendant making the admissions, and in a

case where a motion for separate trial is made on the ground of confessions of others implicating the mover, a severance should be ordered unless the State's attorney declares that the admissions or confessions will not be offered in evidence on the trial or unless there be eliminated from the confessions any reference to the co-defendant." (*People* v. *Fisher*, 340 Ill. 216.) When the statement of Bell was read to the jury the words "the other person" were substituted where the name "Richard Sullivan" occurred, and if the jury learned from other evidence, or inferred, that Sullivan must have been the man referred to as "the other person," the effect, if any, would be to his advantage, for from his statement made to Anderson after signing his confession and testified to by Anderson, it appeared that his motive in being at the restaurant was to rob it of $1000, which sum he was informed was there. Bell's statement, on the other hand, was to the effect that they were at the restaurant to receive $10,000, which they were to get for their connection with another crime and divide as we have already shown, and that Patras made an unprovoked attack upon Sullivan and his death followed. The confession of Sullivan, if true, could hardly result in any other verdict than that which the jury returned. The statement of Bell, if true and competent for the jury to consider in passing upon Sullivan's guilt, might conceivably have resulted in the jury finding him guilty of manslaughter rather than murder. The motion for a separate trial was properly denied.

Sullivan complains of the action of the court in refusing to allow him to argue the question of self-defense to the jury or to instruct the jury on the question. The action of the court was correct in both decisions. There was no evidence on which to base an argument that Sullivan shot in self-defense. There was no reason, therefore, to instruct the jury on that question, and to permit it to be argued would have been a mere waste of time. A burglar rifling a safe who is confronted by the owner with a drawn revolver

has no right to shoot the owner because his life is in imminent danger if he does not, and a robber whose command, "Hands up!" is answered by a shot from his victim's pocket has no right to kill the latter to save his own life. This was the situation presented by Sullivan's confession. Patras' hands were ordered down instead of up. He was ordered to open the safe and did so. Sullivan stooped to get the money. Patras had a legal right to shoot him and kill him. This case must be considered, as far as Sullivan is concerned, as if Bell's statement was not in evidence, and so far as Bell is concerned as if Sullivan's confession was not in evidence. So considered, Sullivan was engaged in the commission of a felony when Patras shot him and was guilty of murder when he killed Patras. Leaving out Sullivan's confession and accepting Bell's statement, he came along to share in the distribution of the spoils of a previous criminal operation. This did not justify him, when Sullivan began shooting, in joining with him in shooting Patras to death.

Complaint is made of the giving of erroneous instructions. The abstract contains the statement: "Instructions given at the request of the People, as follows," with a reference to page 757 of the record. This page reads as follows: "Thereupon the court gave to the jury certain instructions, some of which had been requested by the People through the assistant State's attorneys and others requested by the defendants through their counsel in the case. Said instructions so given by the court to the jury were in words and figures following:" Then follow forty instructions but nothing to indicate who requested any one of them to be given. To have an instruction reviewed the bill of exceptions must show that it was given by the court of its own motion or at the request of a party other than the one complaining of it. Therefore we cannot review the instructions given by the court.

On behalf of Bell it is urged that the court erred in refusing to give instructions 3, 4, 5, 6, 7 and 9. We have

read all these instructions in connection with the instructions given by the court, and we find the principles announced in each of them, so far as they are correct statements of rules of law, are stated in the instructions which were given, in some cases more than once. These instructions have all been set out in the brief for Bell *in hæc verba,* followed by the statement that it is contended by his counsel that a mere reading of the instructions will satisfy the court that each of them is a proper instruction unless a duplicate of an instruction given. This is all that is said on the subject, and having read the instructions with all the instructions given, we have found, as already stated, that everything contained in these instructions which was proper is contained in instructions which were given.

What has been said in regard to the instructions requested by Bell and refused by the court applies also to the instructions requested by Sullivan and refused by the court. Counsel have set out the seventeen instructions which they requested and the court refused, *in hæc verba,* as did counsel for Bell, following them with the invitation to the court to read the instructions and see for itself, without taking the trouble to suggest their specific objections. We have read the instructions with the same result as in the matter of Bell's objections. Instructions 2, 3 and 4 refused are on the subject of self-defense and instruction 5 on manslaughter, and were therefore properly refused, since there was no question of manslaughter or self-defense in the case. For the same reason requested instruction 6 was properly refused. It was on the form of the verdict and included the form for manslaughter, if that should be the verdict.

We find that the defendants have had a fair trial, in which no error intervened which would justify a reversal of the judgment, that the verdict and judgment are just, and the judgment is therefore affirmed. Friday, October 16, 1931, is fixed as the time when the original sentence of death shall be executed.    *Judgment affirmed.*