No. 49,085

State of Kansas, *Appellee,* v. John L. Sullivan, III, and James Joseph Sullivan, *Appellants.*

(578 P.2d 1108)

Opinion filed May 6, 1978.

*Harry L. Eddy,* of Wichita, argued the cause and was on the brief for James Joseph Sullivan, appellant.

*Paul V. Dugan,* of Wichita, argued the cause and was on the brief for John L. Sullivan, III, appellant.

*Stuart W. Gribble,* assistant district attorney, argued the cause, and *Curt T. Schneider,* attorney general, and *Vern Miller,* district attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

FROMME, J.: This is a joint appeal from judgments of conviction and sentence. The judgments were entered on jury verdicts in a joint trial. John L. Sullivan, III, was convicted and sentenced on charges of felony murder (K.S.A. 21-3401), premeditated murder (K.S.A. 21-3401), and criminal injury to persons (K.S.A. 21-3431). James Joseph Sullivan was convicted and sentenced on charges of felony murder (K.S.A. 21-3401) and criminal injury to persons (K.S.A. 21-3431). All charges arose from a shooting incident occurring on June 13, 1975, at the farm home of Randy Moore near Valley Center, Kansas. Lonnie Moore, a cousin of Randy Moore, died of gunshot wounds. Randy Moore was slightly injured by wood splinters caused by a bullet which struck a screen door near where he was standing.

At the outset two preliminary matters should be addressed briefly. In *State v. Kirby,* 222 Kan. 1, 563 P.2d 408 (1977), the provisions of the criminal injury to persons statute, K.S.A. 1976 Supp. 21-3431, are held so vague and uncertain they fail to establish reasonably definite standards of guilt to comply with the constitutional requirements of due process of law. The wording of K.S.A. 21-3431 is identical to that in K.S.A. 1976 Supp.

21-3431. The state concedes the convictions of both defendants under this statute should be and the same are hereby reversed and set aside.

The second matter concerns the two murder convictions imposed against John L. Sullivan, III, arising out of a single homicide. John was convicted and sentenced on both premeditated murder and felony murder. As pointed out in *State v. Jackson,* 223 Kan. 554, 575 P.2d 536 (1978), two first degree murder convictions and sentences stemming from one homicide constitute double punishment and cannot be allowed to stand. When an information charges the defendant with premeditated murder and felony murder for the commission of a single homicide the state may introduce evidence on both theories at the trial, but the trial court should instruct the jury on both theories in the alternative in order to avoid double convictions or sentences. If either or both theories are proven only one conviction of murder in the first degree results. Accordingly, one of the sentences for murder in the first degree against John L. Sullivan, III, arising out of the homicide of Lonnie Moore must be and the same is hereby set aside.

We turn now to the remaining points raised by these two appellants as they bear upon the conviction of each appellant for the murder in the first degree of Lonnie Moore.

The first point we will address relates solely to the appeal of John L. Sullivan, III, hereinafter referred to as John. John raises an issue under *Bruton v. United States,* 391 U.S. 123, 20 L.Ed.2d 476, 88 S.Ct. 1620 (1968), concerning the use of a taped confession given to the police by James Joseph Sullivan, hereinafter referred to as James. James was jointly tried and convicted with John but he did not testify at the trial and could not be subjected to cross-examination. This case illustrates some of the pitfalls encountered in a joint trial of two or more defendants when only one defendant has given a statement or confession to the police.

In a criminal proceeding a previous voluntary statement by the accused relative to the offense charged is admissible as against the accused under K.S.A. 60-460(*f*) as an exception to the rule excluding hearsay evidence. However, such a statement or confession is admissible only against the person making the statement or confession.

Prior to *Bruton v. United States,* supra (May 20, 1968), the prevailing rule in Kansas and elsewhere was:

". . . [W]here two or more defendants are jointly tried for the same offense, a declaration made by one may be admitted in evidence as against the maker, *provided the court, by proper instructions, limits the application of such statement and makes clear to the jury that a statement made by one defendant may be considered against him only and not against a co-defendant.* . . ." (*State v. McCarty,* 199 Kan. 116, 120, 427 P.2d 616 [1967], cert. den. as to McCarty, cert. granted as to Boyd, 392 U.S. 308, 20 L.Ed.2d 1115, 88 S.Ct. 2065 [1968]. Emphasis supplied.)

In *McCarty v. Kansas,* 392 U.S. 308, 20 L.Ed.2d 1115, 88 S.Ct. 2065 (1968), the judgment of the Kansas Supreme Court was vacated with respect to the codefendant Boyd and the case was remanded for further consideration in light of *Bruton v. United States,* supra.

In *Bruton* it was said:

". . . Before discussing this, we pause to observe that in *Pointer v. Texas,* 380 U.S. 400, we confirmed 'that the right of cross-examination is included in the right of an accused in a criminal case to confront the witnesses against him' secured by the Sixth Amendment, *id.,* at 404; 'a major reason underlying the constitutional confrontation rule is to give a defendant charged with crime an opportunity to cross-examine the witnesses against him.' *Id.,* at 406-407." (p. 126.)

The *Bruton* court went on to discuss the reason for the *Bruton* rule and its importance if the defendant's rights are to be protected:

". . . Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift blame onto others. The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination. It was against such threats to a fair trial that the Confrontation Clause was directed. . . ." (pp. 135, 136.)

In *Bruton* the conviction was set aside even though an instruction had been given that the jury was to consider the confession only against the confessor. The *Bruton* rule has been softened somewhat in later cases. In *Harrington v. California,* 395 U.S. 250, 23 L.Ed.2d 284, 89 S.Ct. 1726 (1969), we have an example of this softening. There it was held that although the use of confessions by codefendants who did not testify amounted to a denial of the petitioner's constitutional right of confrontation, the evidence

supplied through such confessions was merely cumulative and the other evidence against the petitioner was so overwhelming that the court could conclude beyond a reasonable doubt that the denial of petitioner's constitutional rights constituted harmless error. In *Harrington* it was stated:

"The question whether the alleged error in the present case was 'harmless' under the rule of *Chapman* arose in a state trial for attempted robbery and first-degree murder. Four men were tried together . . . over an objection by Harrington that his trial should be severed. Each of his three codefendants confessed and their confessions were introduced at the trial *with limiting instructions that the jury was to consider each confession only against the confessor.* . . ." (p. 252. Emphasis supplied.)

The court went on to state:

". . . We do not suggest that, if evidence bearing on all the ingredients of the crime is tendered, the use of cumulative evidence, though tainted, is harmless error. Our decision is based on evidence in this record. The case against Harrington was not woven from circumstantial evidence. It is so overwhelming that unless we say that no violation of *Bruton* can constitute harmless error, we must leave this state conviction undisturbed." (p. 254.)

The evidence of Harrington's participation in the murder was overwhelming. He admitted that he fled from the scene with the other three codefendants. Several of the eye-witnesses placed petitioner at the scene of the crime. The murder arose out of an attempted robbery inside a store which ended in the death of the victim.

Harmless error must depend upon the facts of each case. See *State v. Oliphant,* 210 Kan. 451, 502 P.2d 626 (1972).

The trial court in the present case relied on *United States v. DeBerry,* 487 F.2d 448 (2nd Cir. 1973). This case comes from the second circuit court of appeals in which the principal question raised was a claim of deprivation of the Sixth Amendment right to effective counsel by virtue of the fact that the same attorney represented both appellants below. The major portion of the opinion was devoted to that question. In the opinion the court considered what it referred to as "interlocking confessions" of codefendants. The admission of the confessions was held not to be error since the confessions were substantially the same. However, on a close reading of the opinion it is apparent that the so-called rule of interlocking confessions is not an exception to *Bruton* but is based on the harmless error rule previously discussed.

In *United States v. DiGilio,* 538 F.2d 972 (3rd Cir. 1976), the United States Court of Appeals points this out as follows:

"The harmless error rule is not a predicate for the admission of evidence. We expressly disapprove of the suggestion that there is a 'parallel statements' exception to the *Bruton* rule in this circuit. Hearsay errors both of constitutional and of non-constitutional dimensions will in appropriate cases be regarded as grounds for reversal, and this includes the hearsay error upon which the *Bruton* court focused." (p. 982.)

The trial court in our present case, in admitting the confession of James, relied in part on *United States ex rel. Stanbridge v. Zelker,* 514 F.2d 45 (2nd Cir. 1975), where it was said:

". . . The scope of the *Bruton* decision has been considered by our court on a number of occasions, and we have concluded that error of constitutional dimensions does not inevitably occur *if the questioned confession is admitted under proper instructions from the court concerning its limited use and purpose.* The likelihood of error must be measured against the prejudicial consequences of the failure of the jury to follow the court's instructions, i.e., the 'devastating' effect of the incriminations contained in the codefendant's admissions. [See *Bruton,* at 136, 88 S.Ct. 1620, 20 L.Ed.2d 476]. Where the confession adds nothing to what is otherwise clearly and properly in the case, it can have little 'devastating' effect." (p. 48. Emphasis supplied.)

A confession by an accused relative to the offense charged is admissible only against the confessor and in a joint trial of codefendants it is necessary that an instruction be given to the jury limiting the use and purpose of the confession to a determination of the guilt of the confessor. In the absence of such a limiting instruction this court under the facts of this case cannot say it was harmless error beyond a reasonable doubt.

Now let us turn to the facts of the present case keeping in mind that the admission of the confession of James was a violation of the *Bruton* rule and such violation can be disregarded only if this court can say the error was harmless beyond a reasonable doubt under *Chapman v. California,* 386 U.S. 18, 17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065 (1967), reh. den. 386 U.S. 987, 18 L.Ed.2d 241, 87 S.Ct. 1283; and *State v. Thompson,* 221 Kan. 176, Syl. ¶¶ 4, 5, 558 P.2d 93 (1976).

John gave no statement to the police, but when James was questioned by the police James gave them a taped statement covering the actions of both defendants before, during and after the homicide. James told the police that after he got off work he went over to John's home. John was mad at Randy Moore and

wanted to "get back at Randy." John's purpose in wanting to go to Randy's house was to steal whatever Randy had of value. John and James prepared to go to Randy's house by getting certain things together to take with them. John got his gun, a pack in which to carry things, and a canteen. James took his hunting knife and leather sheath. They walked out to the farm residence of Randy Moore, leaving John's house at 7:00 p.m. John's gun was a Ruger .22-caliber semi-automatic rifle. When they arrived they noticed there were people in the house so they waited behind some outbuildings for the people to leave. They noticed lights in the upstairs windows. John and James split up and took separate positions on opposite sides of the outbuilding near the rear of the house. They were close enough to recognize Randy Moore and his wife standing in front of an upstairs window. After waiting for a half hour James heard someone inside the house suggest they should let the dogs outside. The backdoor opened and two men appeared on the back porch. At that instant James heard shots being fired by John in rapid succession. He saw a flashlight drop on the porch, which flashlight had been carried by one of the men. The two men ran back into the house. James ran over to where John was standing with the gun. He heard Randy Moore scream from inside the house, "They got Lonnie, he's dead, he's dead." The lights went off in the house and both John and James ran. On the way back to Valley Center they hid the gun under a bridge. They arrived back at John's residence at about 1:00 a.m. The following day John and James recovered the gun, dismantled it and scattered the parts along the roadside north of Wichita.

The confession of James as summarized above was not admitted in evidence during the state's case in chief. Instead, the two defendants were tied to the homicide by the testimony of Pat Benefield, a friend of the defendants. He testified that he was present at John's trailer house the night before the homicide. John and James were planning a burglary. They wanted to "rip off" Randy Moore because Randy had taken some items belonging to John. Benefield testified that he was also present the following night when John and James were preparing to go to Randy's house. He drove John and James into the country and let them out within a mile of the Randy Moore residence. He further testified he was present at John's trailer house when John and James returned from the country and John said, "Lonnie, I had to shoot him, he seen me."

John testified in his own defense. His story was different in several details. He explained that Randy and Tami Moore had lived with him prior to the homicide. There had been an argument over Randy selling marihuana and cluttering up John's trailer house. John testified that Randy had several guns and a vicious Doberman pinscher dog. The dog had been trained as an attack dog. When John requested that the Moores move out they did so, but they took some of John's property when they left. This property consisted of five or six stereo records, a knife used by John in his work as a meat trimmer, and a set of three sharpening stones. John's version of how the homicide occurred was that he and James went to Randy's house to search for and obtain the property which belonged to him. He was afraid of Randy and his vicious guard dog. That was why he armed himself. He picked a Friday night because that was a night Randy usually was not at home. When they arrived at the farm house they waited for a half hour, thinking the occupants would leave. John and James had decided to leave when they heard someone inside the house say they were letting the dogs outdoors. John said he never saw anyone on the porch. The dog advanced on him and he emptied his rifle at the dog to defend himself. He and James then beat a hasty retreat after hearing someone inside the house say that Lonnie was dead. John said he barely knew Lonnie Moore and had no reason to shoot him. The general theory of John's defense was that the shooting of Lonnie Moore was done unintentionally while John was leaving the premises and that he shot to protect himself against the vicious guard dog.

In rebuttal the state offered the confession of James which varied from John's testimony at trial in two respects: First, James had said that John and he had gone to Randy's home with the intention of burglarizing the house and taking property belonging to Randy; and second, James had said the shooting occurred immediately after the door was opened and before the dog could have advanced on John.

In admitting the taped confession of James the court stated:

". . . The Court has found two cases that are appropriately in point; one, *United States vs. D. Barry*, 448—strike that—487 F 2d 48, and more appropriate and more recent is the *United States ex rel Stanbridge vs. Selker*, 514 F 2d 45. By combining the testimony of the defendant John with the taped statement of the defendant James, it's fairly clear to this Court that what has been called the

interlocking confession doctrine is totally applicable, which would allow admission of the taped statement as against both defendants. The substance of both the testimony of John and the tape of James is the same, and the Court notes in the two cases that no two confessions are exactly alike, as I note here that these are not exactly alike, but they are substantially the same and their admission is proper.

"Additionally, I think it's appropriate rebuttal because there are, without enumerating them, portions of the tape that are contrary to the defense evidence on the defendants' case in chief, and the tape will therefore be admitted.

"Objections by both defendants are overruled. It's simply an exception to Bruten, and Bruten is not in point." '

In this ruling we believe the court committed reversible error. The so-called "interlocking confession" doctrine is not an exception to the *Bruton* rule. The cases which have been decided subsequent to *Bruton* have consistently pointed out that a limiting instruction must be given to the jury and that the jury can consider each confession only as against the confessor, thus limiting its impact. In the present case no limiting instruction was given. The trial court admitted the taped statement as against both defendants.

In applying the Kansas harmless error rule (K.S.A. 60-2105) to a federal constitutional error a court must be able to declare the error had little, if any, likelihood of having changed the result of the trial and the court must be able to declare such a belief beyond a reasonable doubt. Where the evidence of guilt is of such direct and overwhelming nature that it can be said the erroneous admission of certain other evidence could not have affected the result of the trial, such admission is harmless error. (*State v. Thompson,* supra.)

It would appear that the admission of the statement of James had an adverse effect upon John's theory of defense and when coupled with the refusal of the trial court to give a limiting instruction we cannot say the error is harmless.

The state cites *State v. Greer,* 202 Kan. 212, 447 P.2d 837 (1968), as supporting the admission of the statement of James Sullivan. In *Greer* one of the defendants adopted the confession of a codefendant by an admission to the officers. In the opinion the court states:

". . . This consisted of the testimony of the investigating officer, the clear import of which was that the officer played Bobbie's confession to appellant, appellant admitted orally her [Bobbie's] version was correct except as to the weapon; that appellant stated he 'had not used a weapon to strike him with. That he had only used his fist to strike the man with when he obtained his money';

then, according to the officer's testimony, appellant gave a tape-recorded statement admitting his part in the robbery. Appellant heard Bobbie's statement and, with an exception not here material, he verbally assented to and adopted it; the statement became his own and was thus admissible in evidence against him." (p. 214.)

The admission of the statement in *Greer* did not fall within the *Bruton* rule. The statement was adopted by and became the statement of the person against whom it was offered. It was admitted into evidence under the provisions of K.S.A. 60-460(*h*), which reads as follows:

"As against a party, a statement . . . of which the party with knowledge of the content thereof has, by words or other conduct, manifested his or her adoption or belief in its truth;"

The case does not support the state's position in the present case. The judgment and conviction of John for murder in the first degree must be reversed and remanded for a new trial.

The next point to be considered affects the appeal of both John and James. The trial court refused the defendants' requests to instruct the jury on the lesser included offense of involuntary manslaughter. James was responsible for the conduct of John if he intentionally aided or advised John in the commission of a crime. (*State v. Jackson,* 201 Kan. 795, 799, 443 P.2d 279 [1968], cert. den. 394 U.S. 908, 22 L.Ed.2d 219, 89 S.Ct. 1019 [1969]; *State v. Neil,* 203 Kan. 473, 474, 454 P.2d 136 [1969].)

Involuntary manslaughter is a lesser included offense of first degree murder. (*State v. Seelke,* 221 Kan. 672, Syl. ¶ 1, 561 P.2d 869 [1977].) The statute setting out the elements of involuntary manslaughter states:

"Involuntary manslaughter is the unlawful killing of a human being, without malice, which is done unintentionally in the commission of an unlawful act not amounting to felony, or in the commission of a lawful act in an unlawful or wanton manner. As used in this section, an 'unlawful act' is any act which is prohibited by a statute of the United States or the state of Kansas or an ordinance of any city within the state which statute or ordinance is enacted for the protection of human life or safety." (K.S.A. 21-3404.)

Counsel objected at trial because the involuntary manslaughter instruction was not being given. The court replied:

"I have tried my best to construe these facts in a manner which would find that a verdict of involuntary manslaughter could be upheld, and I simply am unable to do it, period. We had an informal conference in chambers this morning for about an hour and a half during which we discussed nothing but involuntary man-

slaughter. Additionally, I worked on the problem for about an hour over the noon hour. I am firmly of the conviction that if defendants' testimony is believed, they are not guilty, and that is all there is to it. There was no unlawful act as contemplated by the involuntary manslaughter statute committed by the defendants or supported by the evidence. They violated no statute or ordinance which was passed for the protection of human elements or safety, not amounting to a felony. As far as lawful acts are concerned, in an unlawful or wanton manner, if this thing happened the way the defendant says it happened, then it wasn't done in a wanton manner, period, it was done with reasonable care. And in that event, the defendants are just flat not guilty."

K.S.A. 21-3107(3) requires the trial court to instruct on a lesser included offense when there is evidence introduced to support a conviction of the lesser offense. This court has held the duty to instruct on a lesser offense arises only when there is evidence upon which the accused might reasonably be convicted of the lesser offense. (*State v. Seelke,* supra.) Failure to instruct the jury on some lesser degree of the crime charged is not grounds for reversal if the evidence at trial excludes a theory of guilt on the lesser offense. (*State v. Lora,* 213 Kan. 184, 515 P.2d 1086 [1973].) The evidence of a lesser offense need not be extensive nor strong as long as the evidence presents circumstances from which such lesser offense might reasonably be inferred. The unsupported testimony of the defendant alone, if tending to establish such inferior degree, is sufficient. (*State v. Clark,* 218 Kan. 18, 21, 542 P.2d 291 [1975], cert. den. 426 U.S. 939, 49 L.Ed.2d 392, 96 S.Ct. 2657 [1976]. See also *State v. Burrow & Dohlmar,* 221 Kan. 745, 748, 561 P.2d 864 [1977].)

Here defendants argue the jury could have found the defendants had not yet attempted to enter the house and thus were not guilty of attempted burglary. Therefore, they could only have been committing "an unlawful act not amounting to felony," *i.e.,* trespass. Or, they urge, the jury could have found defendants were committing a lawful act—protecting themselves from the dogs—in an unlawful or wanton manner. Whether the shooting is intentional is immaterial; what controls is whether the killing was unintentional. (*State v. Gregory,* 218 Kan. 180, 184, 542 P.2d 1051 [1975].)

There is merit in defendants' argument. We do not agree with the judge that defendants were guilty of first degree murder or not guilty of anything. If the jury found defendants had gone to burglarize the farmhouse but had not yet committed the necessary overt act to make it attempted burglary they had committed

only trespass. In such case the jury could find defendants guilty of involuntary manslaughter.

The state argues that the defendants went to the home of Randy Moore to commit a burglary and were involved in the commission of a felony. In *State v. Rueckert*, 221 Kan. 727, 561 P.2d 850 (1977), it is said:

> "Normally, a trial court is required to give a full range of lesser included offense instructions; however, when a murder is committed during the commission of a felony the rule requiring instructions on lesser included offenses does not apply. [Citations omitted.] If a murder is committed during the perpetration of a felony, the felonious conduct is held tantamount to the elements of deliberation and premeditation which are otherwise required for first degree murder. [Citations omitted.]" (p. 731.)

An exception to the foregoing rule applies when the evidence of the underlying felony is weak or inconclusive. (*State v. Rueckert,* supra.) In *State v. Bradford,* 219 Kan. 336, 548 P.2d 812 (1976), this court states:

> "We find the following cogent comment in 41 C.J.S. Homicide § 392 c, pp. 210, 211:
> " 'It is held or stated that ordinarily, in a felony murder case, the court must charge the various degrees of homicide and may properly refuse to do so when, and only when, no possible view of the facts would justify any other verdict than a conviction of murder in the first degree or an acquittal.' " (p. 343.)

There was no evidence in this case to support a finding by the jury that either of the defendants entered any part of the house. The occupants of the house hid in the attic after the shooting. They testified they heard the back screen door slam. There was no evidence the defendants entered the porch or slammed the door. The occupants speculated it might have been caused by the defendants, the wind or the dog. This testimony would not support a charge of burglary. So the evidence of the underlying crime necessary to prove a felony murder charge could support no more than an attempted burglary.

If the homicide did occur during the perpetration of an attempted burglary the defendants are guilty of felony murder regardless of whether the killing was unintentional. (See *State v. Branch and Bussey,* 223 Kan. 381, 382-383, 573 P.2d 1041 [1978].) Thus, the trial court in refusing the involuntary manslaughter instruction had to find as a matter of law the evidence established that defendants had committed an attempted burglary and the evidence would admit of no other conclusion.

The attempt statute, K.S.A. 21-3301(1), provides:

"An attempt is any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime."

This court has held to prove an attempt to commit a crime an overt act toward the consummation of the crime must be established in addition to intent:

". . . The overt act necessary must extend beyond mere preparations made by the accused and must approach sufficiently near to consummation of the offense to stand either as the first or some subsequent step in a direct movement toward the completed offense." (*State v. Gobin,* 216 Kan. 278, Syl. ¶ 3, 531 P.2d 16, 76 A.L.R.3d 832 [1975].)

At page 281 of the *Gobin* opinion the court quotes from the comments to the committee to PIK Crim. 55.01:

" '. . . On the one hand mere acts of preparation are insufficient while, on the other, if the accused has performed the final act necessary for the completion of the crime, he could be prosecuted for the crime intended and not for an attempt. The overt act lies somewhere between these two extremes and each case must depend upon its own particular facts. . . .' "

The court in *Gobin* further states:

". . . The accused must have taken steps beyond mere preparation by doing something directly moving toward and bringing nearer the crime he intends to commit. It is sometimes said there must be some appreciable fragment of the crime committed. . . ." (p. 281.)

In *State v. Gobin,* supra, this court held mere presence at the scene with a truck equipped with stock racks did not necessarily establish the overt act toward perpetration of a theft of pigs. In our present case the underlying felony claimed was an attempted burglary of a farmhouse. "Burglary is knowingly and without authority entering into or remaining within any building, . . . with intent to commit a felony or theft therein." (K.S.A. 21-3715.) The defendants did not attempt to enter the farmhouse so the state had to rely on something other than that to prove some overt act towards perpetration of the burglary. Applying what is said in *State v. Rueckert,* supra, and *State v. Bradford,* supra, to the facts of the present case we cannot say that the evidence of the underlying felony was so compelling that there was no possible way a jury could find the state had failed to prove the overt act to complete the crime of attempted burglary. We hold the trial court erred in refusing to instruct the jury on involuntary manslaughter.

The convictions of both John and James must be reversed and the case remanded for a new trial.

Several additional points raised by the appellants are of such nature that they will probably arise in a second trial of this case. We will discuss these briefly.

It is argued the court erred in admitting a hunting knife into evidence at the trial. The knife was carried by James on his person when he made the trip to the farm residence. It was obtained by the police from a residence where James and his girl friend, Stacey Steffy, were living. They were living with Stacey's father, William Steffy. Detective Howard obtained Stacey's consent and signature on a form waiving the requirement of a search warrant. The knife in question was obtained when Detective Howard searched the residence, including the bedroom occupied by James and Stacey.

When two or more persons jointly occupy living quarters the consent of one of them is sufficient to form a basis for a valid search. (*State v. Jakeway,* 221 Kan. 142, 558 P.2d 113 [1976]. See also *State v. Boyle,* 207 Kan. 833, 486 P.2d 849 [1971].) We note in the present case the witness to the seizure was not endorsed on the information and no motion to suppress was made before trial as required by K.S.A. 22-3216(3); however, the effect of these matters will not be discussed since such procedural matters may be taken care of before a retrial of the case.

The appellants contend that Pat Benefield was an incompetent witness because he had participated in the crime and was under threat of being charged. It is further argued that his testimony should not have been admitted because he was a delinquent minor placed under jurisdiction of the juvenile court.

The effect of granting immunity to a witness who participated in the crime bears upon the weight and credibility to be given his testimony. Such a witness is not incompetent to testify. (*State v. Wheeler,* 215 Kan. 94, 99-100, 523 P.2d 722 [1974]; *State v. Montanez,* 215 Kan. 67, 523 P.2d 410 [1974].) The trial court properly exercised its discretion in allowing Pat Benefield to testify. He was of sufficient age and his testimony did contradict and rebut testimony given by defense witnesses. (*Jacks v. Cloughley,* 203 Kan. 699, Syl. ¶ 1, 457 P.2d 175 [1969].)

It is argued the trial court erred in refusing to allow John's employer to testify as to John's good character. The statute, K.S.A.

60-446, authorizes the defendant to introduce evidence of good character. It reads:

"When a person's character or a trait of his or her character is in issue, it may be proved by testimony in the form of opinion, evidence of reputation, or evidence of specific instances of the person's conduct, subject, however, to the limitations of K.S.A. 60-447 and 60-448."

K.S.A. 60-447 provides, if a character trait is relevant, evidence of specific instances which tend to prove the trait may be introduced in a criminal action *if offered by the accused to prove innocence.* K.S.A. 60-448 relates to traits of care and skill and is inapplicable in the present case.

The state argues the testimony was offered in support of defendant's credibility and properly excluded as not bearing on truth and veracity. The record indicates that appellant John was attempting to introduce evidence of his good character and it was error for the trial court to sustain the state's objection to this evidence. It is not necessary for us to determine whether the error was harmless since a new trial is necessary on other grounds.

It is argued the trial court erred in failing to properly instruct the jury on the elements necessary to establish first degree murder under the felony murder rule. The trial court instructed the jury that to prove felony murder it was not necessary for the state to prove that the killing was malicious and willful with deliberation and premeditation. This is in accord with what is said in *State v. Goodseal,* 220 Kan. 487, 491, 553 P.2d 279 (1976); and *State v. Clark,* 204 Kan. 38, 43, 44, 460 P.2d 586 (1969). See also PIK Crim. 1975 Supp. 56.02 for the standard instruction on felony murder.

The appellants also objected at trial to the court's instruction No. 12 which was as follows:

"Under Kansas law, the circumstances in this case are such that the defendants cannot claim the defense of self-defense, and you will not consider this as a defense."

On appeal they argue the court erroneously destroyed their defense by giving such an instruction. They point out that their version of the incident was that they were withdrawing at the time the shots were fired; that no overt act toward a burglary had been completed; that John believed himself to be in imminent danger from the attack of a vicious trained guard dog; and that he fired at the dog, not knowing the victim and Randy Moore were in

the line of fire. The trial court before giving the instruction commented that the law is such that a person cannot create the circumstances that would make it necessary for him to commit homicide and rely on self-defense. The question raised by the appellants is not without difficulty in this case.

K.S.A. 21-3211 provides:

"A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself or another against such aggressor's imminent use of unlawful force."

Under K.S.A. 21-3214 the use of force is not available to a person and he has no right of defense if he is attempting or committing a forcible felony, or is escaping after committing it. A person has no right of defense if he initially provokes the use of force against himself, unless he has reasonable ground to believe he is in imminent danger of death or great bodily harm, and he has exhausted every reasonable means to escape such danger other than the use of such force as is likely to cause death or great bodily harm to the assailant.

Our statute, K.S.A. 21-3214, was modeled after Ill. Ann. Stat. ch. 38, § 7-4. In *The People v. Sullivan,* 345 Ill. 87, 177 N.E. 733 (1931), it is said a burglar rifling a safe who is confronted by the owner with a drawn revolver has no right to shoot the owner because his life is in imminent danger if he does not, and a robber whose command, "Hands up!" is answered by a shot from his victim's pocket has no right to kill the latter to save his own life. See also *People v. Gates,* 47 Ill. App. 3d 109, 5 Ill. Dec. 486, 361 N.E.2d 809 (1977).

The difficulty in instructing against self-defense in the present case arises from the sharp conflict in the two versions of what happened. It is a jury question whether there was a completed crime or a thwarted intent, unless the evidence is so conclusive as to preclude submission of one in favor of the other. (*State v. Awad,* 214 Kan. 499, 520 P.2d 1281 [1974].) If the jury should find, as it did in entering a verdict of felony murder in the case, that the defendants had committed the necessary overt act and were guilty of an attempted burglary, then the shooting occurred while escaping therefrom and a claim of self-defense was not available to them. However, when the instructions were given it was possible the jury might find no overt act had been committed.

In such case the defendants had not proceeded beyond the stage of intent and preparation for burglary. The defendants are entitled to an instruction on their theory of the case even though the evidence introduced thereon is slight and supported only by defendants' own testimony. (*State v. Smith,* 161 Kan. 230, 167 P.2d 594 [1946]; *State v. Schoenberger,* 216 Kan. 464, 532 P.2d 1085 [1975].)

It is true the deceased was not personally the alleged aggressor, the dog was. However, where a third person is killed unintentionally, if the circumstances would excuse the killing of the assailant the unintentional killing of another may also be excused. (40 Am. Jur. 2d, Homicide, § 144, p. 432.) The problem here is that the instruction given by the court took from the jury the decision as to whether the defendants had completed the necessary overt act and attempted the burglary.

On a new trial under similar facts it would appear to be the better practice to allow the jury to determine if the overt act had been committed. If the defendants were guilty of the crime of attempted burglary self-defense was not available to them. In such case the defendants were not justified in the use of force against the threat of an assailant whether it be a guard dog or a person.

Various other points have been raised concerning procedural matters such as failure to comply with a discovery order, claimed errors in the admission and exclusion of testimony, restriction on cross-examination, improper comments by the prosecutor in front of a juror outside the courtroom, exclusion of five of fourteen pictures of the scene of the homicide, restriction of defense counsel in his closing statement and failure of the court to respond to questions by the jury. These matters rest largely in the discretion of the trial court. No abuse of discretion appears in the record as to these matters and further comment is unnecessary.

The judgments on the convictions of both defendants are reversed, the sentences are set aside, and the case is remanded for a new trial.

MILLER, J., concurs in the result.