No. 52,926

STATE OF KANSAS, *Appellee,* v. DARRELL J. STAAB, *Appellant.*

(635 P.2d 257)

Opinion filed October 23, 1981.

*Richard D. Coffelt,* of Martin & Coffelt, of Hays, argued the cause and was on the brief for the appellant.

*John C. Herman,* county attorney, argued the cause, and *Robert T. Stephan,* attorney general, was with him on the brief for the appellee.

The opinion of the court was delivered by

HERD, J.: Darrell J. Staab was convicted by a jury of murder in the second degree (K.S.A. 21-3402) on December 19, 1980, for the shooting death of Gary Mayfield on August 8, 1980, in Hays. Staab moved for a new trial which was denied.

This is a case of a rejected lover. It all began in February of 1979 with Darrell Staab going to the Hays American Legion Club. Marjorie Turley was the bartender. They struck up a friendship which ripened into a closer relationship as time went by. At the time, Staab worked as a mechanic for Urban Motors. Later he operated a repair shop in partnership with his brother, Lambert Staab, in Hays. Ms. Turley was estranged from her husband, Gary Turley, at the time and was later divorced from him. She had been previously married to Jim Simons by whom she had five children. She had two stepchildren by Gary Turley. Ms. Turley commenced stopping by the repair shop two or three times a week under various pretenses but for the actual purpose of seeing Darrell Staab. On the days she did not come to see Staab, she called him. There was evidence Staab stayed overnight with Ms. Turley at her rural residence located north of Yocemento

and that Marjorie occasionally stayed overnight with Darrell at his residence in Hays. They discussed marriage but nothing came of it — at first, because Ms. Turley was already married and later because of the intervention of a new lover.

In late October, 1979, Marjorie Turley met Gary Mayfield. They began dating, and at Thanksgiving time Marjorie moved into his house at 1504 Fort Street, Hays, to live with him, after Gary persuaded his previous girlfriend to move out. Marjorie obtained a divorce from Turley in January of 1980.

Mayfield worked the 3:00 p.m. to 11:00 p.m. shift on an oil rig. There was evidence Marjorie Turley had dates with Darrell Staab in the early evening while Mayfield was at work. Staab accepted Marjorie's life style, but with some reluctance. He told her if Mayfield did not treat her right he would blow him away. He repeated the threat two or three times.

In July of 1980, Gary Mayfield and Marjorie Turley decided they would get married. They set the wedding date for August 8, 1980, at 4:00 p.m., at the Methodist Church. Marjorie kept seeing Darrell Staab but at less frequent intervals. She also called him on occasion. As the time for the wedding approached, Staab became more and more disturbed about it. He would go to the American Legion and VFW clubs and see the people he knew, including Mayfield, and pretend to be happy and carefree but his friends detected a bitterness about him. He pretended to like Mayfield, congratulated him and said the "best man won," but the next time he saw Mayfield, he insulted him with a sarcastic remark. His deep resentment showed through. At one time Mayfield responded to a friendly gesture from Staab by telling him he was always welcome at Mayfield's house. Staab was to use that as an excuse later. Staab's mother, brother and friends became concerned about his attitude and worried about him harming himself.

August 8, 1980, was a tough day for Darrell Staab. He tried to work but nothing went right. Lambert Staab and his wife, Rita, noticed his problem. At 5:00 p.m. Lambert suggested they close the shop early and have a beer and talk awhile. This they did. Rita brought them a case of beer and the two sat in the office until 9:00 p.m., drinking beer and a small amount of tequila. When Norman Kinderknecht and Kenneth Meier came by for Darrell, Lambert went home. Kinderknecht, Meier and Darrell Staab had pre-

viously planned to go to the Ellis County fair and enter the pig wrestling contest. They gave up that plan because of Darrell's depression. While in the Staab Repair Shop, Darrell asked Kinderknecht to speak to someone on the phone; Staab had dialed a number and Kinderknecht expected a man to answer, but the answering voice was that of Marjorie Mayfield. They exchanged pleasantries during which Marjorie invited Norman to a wedding beer party at the park. He then hung up. Staab immediately rang Marjorie's number again and spoke to her briefly.

Meier, Kinderknecht and Staab then left the shop and drove two vehicles to the Dillon's store where Darrell purchased groceries. Upon leaving Dillon's, they put the groceries in Staab's pickup and all three got in. Darrell drove to the park, searching for the wedding party. He found it on the west side but drove on by, stopping only momentarily to talk to some acquaintances. The three then proceeded to Staab's house. It was approximately 10:30 p.m. Kinderknecht and Meier did not go inside the house; they sat on the front porch. Staab came out of the house carrying a shotgun and a rifle. On the way out, Darrell hit the action and a shell fell out of one of the guns. Darrell pushed the shell back in the magazine, pumped another one in and fired the gun into the air. He placed the shotgun and rifle in the pickup, then went back in the house for more guns. He then came out with the second bunch of guns which he threw in the pickup. Darrell then asked his companions if they were ready to go. Norman refused to leave with the arsenal. All three of them then removed the guns from the pickup and returned them to the house. While in the house Darrell showed them his guns, including a rifle, shotgun and a .44 caliber Ruger pistol. The guns were all loaded, and Darrell's loose handling of them made Norman and Kenneth nervous. Staab then asked Kinderknecht if he had ever fired a Ruger and said that he should try his. After that Staab walked to his front door and fired a round into the darkness. Soon a neighbor called and asked what the shooting was about. Darrell said he was shooting some firecrackers.

Staab, Meier and Kinderknecht then left the house. The pistol was left lying on top of the couch in the living room. The rest of the guns were stashed in various corners of the room. It was now about 11:00 p.m. They got in Staab's pickup and he drove them back to the park. This time they stopped at the party. Darrell went

to the party; the other two stayed close by the pickup. As Darrell walked in, Marjorie's sister stopped him and asked him what he was doing there and demanded he leave. Staab then went back to the pickup and they left. They drove back to Dillon's to get Meier's vehicle, transferred Staab's groceries to it and talked for about ten minutes. Meier and Kinderknecht got in Meier's car with the impression Darrell would follow them to Norman's house for supper. Instead of following, Darrell drove off in the opposite direction. Staab's behavior disturbed Meier and Kinderknecht so much they drove to Lambert Staab's house, awakened him and discussed Darrell's moodiness with him and his wife Rita. When Norman and Kenneth again started for Norman's house, they saw the sheriff's car going toward Darrell's house and an ambulance going toward Fort Street. It was between 11:30 and 12:00 midnight.

After Darrell Staab left the other two men, he claims he drove directly to the park again and asked for Gary Mayfield. He was told the Mayfields had gone home. The other version, testified to by Rae Ann Power in her deposition, was that Staab showed up at the park, this time with a pistol stuffed in the front of his trousers. Marjorie and Gary Mayfield saw Staab approaching and left for home prior to his arrival at the party in order to avoid a confrontation. Mrs. Power told her husband about the gun, after which they also hurriedly left the party area in the park. Staab then either went home for his gun or went with his gun directly to Gary Mayfield's house. He parked in front, walked up and banged a number of times on the unlocked front door. Marjorie and Gary were in the bathroom and heard the banging on the door. They did not want a disturbance so they decided to awaken Marjorie's mother, who was asleep nearby, and have her answer the door. They didn't have time to carry out their plan; Staab opened the front door and marched in without ceremony. He claimed Mayfield's previous invitation to stop by anytime still stood. Gary heard him come in the front room, came out of the bedroom and angrily admonished Darrell for walking in uninvited and showed him the door. Darrell Staab retreated slowly through the front door to the porch, then down a step or two. Marjorie had followed both of them to the front door; then she turned back into the house. Gary was dressed in cut-off blue jeans with no shirt, obviously unarmed. As Darrell Staab stepped

backward down the steps, he pulled out his .44 Ruger and fired three shots at Gary Mayfield. Two of the shots hit Mayfield — one at an upward angle. The other entered Mayfield's back from above as if fired after he was down. Mayfield died within a few minutes.

After the shooting, which was observed by a neighbor across the street, Staab walked slowly to his pickup, got in and drove calmly away. When Staab got home, he called the police dispatcher and told him Mayfield had been shot and that he had done the shooting. The dispatcher turned the call over to Sheriff Dave Wasinger, to whom Darrell Staab responded, "Dave, yeah, I shot the son-of-a-bitch." Sheriff Wasinger went directly to Staab's house where he found Rita Staab on the front porch and Darrell on the phone in the kitchen. It was later leaned that Darrell Staab had called the Mayfield house three times immediately after the shooting. Mrs. Anne Long, Marjorie's mother, answered the first call. Staab said, "I want to talk to Marge." Mrs. Long told him he couldn't and he said, "You tell her that I did what I said I was going to do." She then hung up the phone and he called right back. Lucy Jane Vanderpool answered it this time and told Staab Marjorie couldn't come to the phone, to which he responded, "Is she in shock?" Mrs. Vanderpool replied, "Yes, of course, what did you expect?" He said, "I did it. I know what is best for Marge. She can be happy." Staab called the Mayfield house one more time and asked for Marjorie then hung up when she wouldn't come to the phone.

When Darrell finished his telephoning, the sheriff and Rita entered his house. The sheriff then gave Darrell a *Miranda* warning and took his first statement. Staab readily admitted the whole scenario except in his first statement he claimed Mayfield had reached for something under his shirt or vest which had prompted the shooting. At trial his testimony was changed, saying Mayfield reached across his body for something and he shot him in self-defense. The jury convicted Darrell Staab of second degree murder. He was sentenced to fifteen to fifty years in prison. This appeal followed.

Appellant's first issue challenges the admissibility of the deposition of Rae Ann Power. Mrs. Power neither waived, read nor signed the deposition and no specific finding of her unavailability was made by the court. Rae Ann Power testified in her deposition

she saw the defendant with a pistol in his belt on his third trip to the park on August 8. Defendant says he went home and got the pistol after the visit to the park. It was learned Mrs. Power would have to undergo cancer surgery immediately prior to the trial and would be unavailable to testify. Based on this information the State filed a motion to take her deposition. A hearing was held by the district judge on December 4, 1980, to determine if her deposition could be taken for introduction at trial. Staab, his attorney and the prosecutor appeared at the hearing which produced this exchange:

"MR. JETER: Your Honor, I think what Mr. Coffelt, the Defendant and I have agreed to do at this point in time — I've got a witness who undergoes surgery for cancer December 11th and will not be available to testify at the time of the trial and I think it's imperative that her testimony be received by the jury and by statute I have a right, I believe, to take her deposition or make application to the Court to have a leave to take her deposition which can be admitted at the time of trial, which is what I'm doing now.

"THE COURT: Which statute are you relying on?

"MR. JETER: 22-3211. I don't think Mr. Coffelt has any objection. We need to basically just set up a time to get it done.

"MR. COFFELT: Mr. Staab, do you understand what this problem is?

"MR. STAAB: Yes.

"MR. COFFELT: You understand that Mrs. Power can't be at the trial but the State wants her testimony, that they have a right under that statute to get it. And you further understand that whereas I can probably resist this move somewhat that they're finally going to get this done one way or the other. Do you have objection to my agreeing to set a deposition for Mrs. Power? You'll be present at that time. You fully understand it?

"MR. STAAB: Yes.

"MR. COFFELT: Mr. Jeter, — I would agree, Your Honor. Could I ask one thing of the Court? I think this is reasonable. That the deposition testimony, once taken, be kept away from the press. I don't want it being pre-printed or anything. That the deposition be held by the Court.

"THE COURT: I think most depositions that are filed by the Court Reporters in the file have something on it that they're not supposed to be opened except by order of the Court anyway, isn't that correct? They seal it?

"MR. COFFELT: I just wouldn't want this being pre-printed or anything.

"THE COURT: You don't have any problem with that, do you?

"MR. JETER: I don't, Your Honor.

"THE COURT: I think that's the way most of them are anyway.

"MR. JETER: I wonder, Your Honor, because apparently you're going to be gone most of next week, if we might not talk now about how we're going to present the deposition at the time of trial? Whether we want to order somebody to read her answers or —

"MR. COFFELT: I don't think there's any real problem with that.

"THE COURT: I think you could have Lenora do it, you could have the court

reporter do it. The court reporter doesn't need to take it down, he's got it in writing anyway. I don't think there's going to be any problem.

"MR. COFFELT: Mr. Jeter, let's do this at either your private office or at mine."

The court ordered the taking of the deposition. Thereafter at the trial the following evidence was adduced from Keith Power, husband of deponent:

"Q. Mr. Power, where is your wife Rae Ann today?

"A: Today she is home, but she has been in the hospital.

"Q. She just recently had surgery?

"A. Yes.

"Q. Because of the surgery she is unable to testify today?

"A. Yes."

Prior to reading Rae Ann Power's deposition to the jury, defendant objected:

"MR. COFFELT: Comes now the Defendant and respectfully makes an objection to the recitation of the deposition taken of Rae Ann Power. Your Honor, in support of that objection the Defendant shows the Court that the deposition, the original copy thereof, is not signed as required by law, nor has there been a waiver of such signature of the original copy entered in the record.

"Mr. Staab makes no objection about the notices that lead up to the taking of it, or the presence or chance to cross examine. However, in a case of this magnitude, I don't think I can let her unsigned testimony go into the record in deposition form, the signature on which has not been waived.

"Now, if Mr. Jeter wants to go get the signature, that is fine, but at least that is the objection of the Defendant."

Defendant argues since there was no formal finding the witness was unavailable and no attempt was made to assure her presence by use of a subpoena, her deposition is inadmissible hearsay. The trial court admitted the deposition into evidence.

Let us examine the relevant statutes. K.S.A. 22-3211(7)(c) provides:

"At the trial or upon any hearing, a part or all of a deposition, so far as otherwise admissible under the rules of evidence, may be used if it appears:

. . . .

"(c) That the witness is unable to attend or testify because of sickness or infirmity . . . ."

K.S.A. 60-459(g)(3) defines "unavailable as a witness" as:

"[U]nable to be present or to testify at the hearing because of . . . then existing physical or mental illness . . . ."

K.S.A. 60-460(c)(2) provides deposition testimony is an excep-

tion to the hearsay rule "if the judge finds that the declarant is unavailable as a witness at the hearing . . . ."

In this case the State established Mrs. Power's illness to the satisfaction of the court in the hearing prior to taking her deposition. The defendant did not object. At trial the State introduced evidence of the witness's illness where defendant's objection did not go to unavailability of the witness.

The requirements of K.S.A. 22-3211(7)(c) were met. The trial court found by overruling defendant's objection and admitting the deposition that Mrs. Power was unavailable because of her sickness. Defendant ratified the finding by failing to object on this ground. He had, in fact, previously stipulated with the State as to her sickness. Thus, there was no controversy regarding the unavailability of Rae Ann Power, and a formal finding by the trial court was unnecessary, as was issuance of a subpoena. Defendant also specifically waived any objections based on his right to confront the witness. For this reason any further discussion of the constitutional right to confrontation is not warranted. We hold the witness was unavailable.

As a final point on this issue, appellant argues the deposition of Mrs. Power is inadmissible because it was unsigned and unread by the witness. K.S.A. 60-230(e) states:

"When the testimony is fully transcribed the deposition shall be submitted to the witness for examination and shall be read to or by him, unless such examination and reading are waived by the witness and by the parties. Any changes in form or substance which the witness desires to make shall be entered upon the deposition by the officer with a statement of the reasons given by the witness for making them. The deposition shall then be signed by the witness, unless the parties by stipulation waive the signing or the witness is ill or cannot be found or refuses to sign. The officer before whom the deposition is taken shall submit the deposition by sending it by restricted mail, or by hand delivering it, either to the witness or to the attorney for the witness if the witness be a party to the lawsuit.

"If the deposition is not signed by the witness, or not returned within the time limitation herein provided, the officer shall sign it, or a copy thereof, and state on the record the fact of the waiver or of the illness or absence of the witness or the fact of the refusal to sign, together with the reason, if any, given therefor, or the fact of the failure to return the deposition within thirty (30) days after having been submitted, and the deposition may be used as fully as though signed, unless on a motion to suppress, under K.S.A. 60-232(d)(4), the judge holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part."

It is conceded Mrs. Power neither waived, signed nor read the deposition and the reporter so certified. This court has dealt with similar issues but none directly on point.

In *Grubb, Administrator v. Grubb,* 208 Kan. 484, 493 P.2d 189 (1972), the witness whose deposition was admitted into evidence was found to be ill and unable to read or sign the document when it was forwarded to his counsel and remained ill until his death, never signing. In *Ballhorst v. Hahner-Foreman-Cale, Inc.,* 207 Kan. 89, 484 P.2d 38 (1971), the court admitted an unsigned deposition, but there the witness died the day after it was taken. In *State v. Frideaux,* 207 Kan. 790, 487 P.2d 541 (1971), the court excluded a statement given merely in deposition "form," in total noncompliance with the statute. In the present case, everything was proper except the signature.

Judge Spencer Gard offers some guidance. He states the formality of signing the deposition is not extremely important and can be dispensed with by waiver of the parties or if the witness is ill or refuses to sign as in the instant case. Gard says having the deponent read the deposition is much more important than the signing. It cannot be waived by the parties, only by the witness. However, Gard believes that fairness requires only an opportunity for the witness to read and sign the deposition. Gard's Kansas C. Civ. Proc. 2d § 60-230(e) (1979).

In the discussion of availability we found Mrs. Power was sick. That clearly meets the exception to the signing requirement. We so hold. With regard to reading her deposition, the court reporter made an appointment with Rae Ann Power for a time and place of reading the document, which appointment was not kept by Mrs. Power. We hold the witness was afforded an opportunity to read her deposition but failed to do so and thereby waived the reading. The trial court did not err in admitting the deposition into evidence. The issue is without merit.

Appellant next contends that the court erred when it refused to allow witnesses for the defendant to testify as to out-of-court statements made by defendant. At trial the prosecution objected to such testimony on the grounds it would constitute hearsay. Indeed, such out of court statements by a defendant are hearsay, but the appellant argues that they should have been received under K.S.A. 60-460(*a*), which would admit:

"A statement previously made by a person who is present at the hearing and available for cross-examination with respect to the statement and its subject matter, provided the statement would be admissible if made by declarant while testifying as a witness."

In overruling the defendant's motion for a new trial, the district court held that *State v. King,* 221 Kan. 69, 72, 557 P.2d 1262 (1976), controlled. That case also involved a defendant who attempted to introduce evidence of out-of-court statements made by her. There the defendant, before she took the stand, offered to introduce a tape recording she had made subsequent to her arrest. The court held that since defendant had not yet taken the stand, she was still protected by her Fifth Amendment privilege. Consequently, she was not "available for cross-examination" under K.S.A. 60-460(*a*). See also *State v. Myrick & Nelms,* 228 Kan. 406, 422, 616 P.2d 1066 (1980).

Before the testimony of Lambert Staab and another witness was offered, Darrell Staab orally stipulated he would testify and waive his Fifth Amendment rights. Even with a prior waiver, Kansas cases require a witness to actually take the stand and testify before he or she is deemed "available" for purposes of K.S.A. 60-460(*a*). In *State v. Fisher,* 222 Kan. 76, 80-81, 563 P.2d 1012 (1977), the court held that out-of-court statements made by a declarant could not be introduced against the defendant until the declarant had been put on the stand and subjected to cross-examination. Even though the declarant was available in the courtroom, the defendant's right to confrontation required this added protection. See also *State v. Sanders,* 224 Kan. 138, 144, 578 P.2d 702 (1978).

*Fisher* differs from the present case, of course, in that this case involves out-of-court statements made by the defendant himself. Hence, there is no confrontation clause problem. The same reasoning used in *Fisher,* however, should apply. The major purpose of the confrontation clause is to ensure that the defendant has an opportunity to effectively cross-examine the witness against him. See *Ohio v. Roberts,* 448 U.S. 56, 65 L.Ed.2d 597, 100 S.Ct. 2531 (1980); *California v. Green,* 399 U.S. 149, 26 L.Ed.2d 489, 90 S.Ct. 1930 (1970). The main concern of K.S.A. 60-460(*a*) is that the declarant be "available for cross-examination." A defendant is not available for cross-examination until he takes the stand and waives his right against self-incrimination. Indeed, even if the defendant makes a prior oral waiver, there are circumstances in which that waiver can be effectively withdrawn. See *Stevens v. Marks,* 383 U.S. 234, 15 L.Ed.2d 724, 86 S.Ct. 788 (1966).

Since the defendant Staab had not yet taken the stand and

begun to testify when the out-of-court statements were offered, he was not yet "available for cross-examination." The testimony was properly excluded.

Appellant's final contention is that the court erred in refusing to instruct the jury on the lesser included offense of involuntary manslaughter. The trial court's duty to instruct the jury on lesser included offenses is governed by K.S.A. 21-3107(3):

"In cases where the crime charged may include some lesser crime it is the duty of the trial court to instruct the jury, not only as to the crime charged but as to all lesser crimes of which the accused might be found guilty under the information or indictment and upon the evidence adduced, even though such instructions have not been requested or have been objected to."

The rule is well established that the duty to instruct on lesser included crimes arises only when there is evidence under which the defendant might have reasonably been convicted of the lesser offense. *State v. Everson,* 229 Kan. 540, 542, 626 P.2d 1189 (1981); *State v. Prince,* 227 Kan. 137, Syl. ¶ 1, 605 P.2d 563 (1980); *State v. Sullivan & Sullivan,* 224 Kan. 110, 120, 578 P.2d 1108 (1978); *State v. Seelke,* 221 Kan. 672, 675, 561 P.2d 869 (1977); *State v. Gregory,* 218 Kan. 180, 183, 542 P.2d 1051 (1975). Thus, if the evidence offered excludes a theory of guilt on a lesser included offense, the instruction need not be given. See *State v. Cates,* 223 Kan. 724, 576 P.2d 657 (1978). *State v. McDermott,* 202 Kan. 399, 449 P.2d 545, *cert. denied* 396 U.S. 912 (1969). The evidence supporting the lesser crime, however, need not be overwhelming. The instruction should be given even if the evidence is weak and inconclusive or consists solely of defendant's testimony. *State v. Sullivan & Sullivan,* 224 Kan. at 120; *State v. Seelke,* 221 Kan. at 676. These rules are designed to give the defendant the "right to have the court instruct the jury in the law applicable to his contention  .  .  .   To refuse so to instruct the jury would be to invade its province in the trial of a case." Thus if there is "any substantial evidence tending to prove an inferior degree of the offense", the instruction must be given. *State v. Buffington,* 66 Kan. 706, 709-10, 72 Pac. 213 (1903); *State v. Clark,* 214 Kan. 293, 521 P.2d 298 (1974).

How do the facts of the present case fall within the previously discussed principles? This determination must be based on the elements of involuntary manslaughter. K.S.A. 1980 Supp. 21-3404 defines the crime:

"Involuntary manslaughter is the unlawful killing of a human being, without malice, which is done unintentionally in the wanton commission of an unlawful act not amounting to felony, or in the commission of a lawful act in an unlawful or wanton manner. As used in this section, an 'unlawful act' is any act which is prohibited by a statute of the United States or the state of Kansas or an ordinance of any city within the state which statute or ordinance is enacted for the protection of human life or safety."

Is there evidence under which the defendant might reasonably have been convicted of this lesser offense? We think not. First there must be evidence the killing was unintentional. The defendant merely testified he did not intend to kill Mr. Mayfield when he shot him. This court has held that even though the *shooting* is intentional, only the *killing* must be unintentional to fall within the definition of involuntary manslaughter. *State v. Gregory*, 218 Kan. at 184; *State v. Childers*, 217 Kan. 410, 416, 536 P.2d 1349 (1975). But even if the killing is unintentional there must be evidence it was done either 1) in a wanton manner during the commission of a misdemeanor, or 2) during the commission of a lawful act in an unlawful or wanton manner.

Defendant claims part two of the test is satisfied because in shooting Mayfield, he committed the lawful act of self-defense in a wanton manner through the use of excessive force. This court has recognized that as a viable argument. See *State v. Gregory*, 218 Kan. at 185-86. Here, however, there was no substantial evidence of either element of involuntary manslaughter. The defendant's bare statement, unsupported by other evidence, is the only possible evidence of unintentional killing or self-defense. When the defendant's statement is considered against the volume of uncontroverted, competent evidence of defendant's jealousy and dislike of the victim; his going to his house and obtaining a loaded pistol before calling on the victim late at night; his walking into the victim's house uninvited; his shooting the obviously unarmed victim twice, with one of the shots entering the victim's back; along with defendant's gloating phone call to "tell Marge I did what I said I'd do," it renders his bare statement insubstantial. We hold the defendant's theory of unintentional killing and self-defense is not supported by substantial evidence. This issue is without merit.

The judgment of the trial court is affirmed.