No. 65,045

STATE OF KANSAS, *Appellee,* v. CAIN DIXON, JR., *Appellant.*

(811 P.2d 1153)

Opinion filed May 24, 1991.

*Thomas Jacquinot,* assistant appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with him on the brief for appellant.

*Debra Byrd Wagner,* assistant district attorney, argued the cause, and *Robert T. Stephan,* attorney general, and *Nola Foulston,* district attorney, were with her on the brief for appellee.

The opinion of the court was delivered by

HERD, J.: Cain Dixon directly appeals his jury convictions for first-degree murder, K.S.A. 1989 Supp. 21-3401; attempted first-degree murder, K.S.A. 1989 Supp. 21-3301 and K.S.A. 1989 Supp. 21-3401; and aggravated burglary, K.S.A. 21-3716. Dixon was sentenced to life imprisonment for the first-degree murder conviction, 15 years to life for the attempted murder conviction, and 5 to 20 years for the crime of aggravated burglary. The sentences run consecutive to each other and consecutive to any sentence resulting from parole revocation. Dixon appeals.

The facts giving rise to this case are in dispute and, therefore, are set out in detail. Bonnie Dixon and Cain Dixon began dating in 1986. Bonnie and her daughters, Ada, Stephanie, and Brandy, moved from Wichita to Lawrence in the summer of 1987 to live with Dixon. Bonnie became pregnant and the couple married in January 1988. Anna was born in September the same year.

By the summer of 1989, Bonnie and Dixon were having marital problems. Bonnie wanted to work; Dixon was jealous of anything she did out of his presence and accused her of seeing other men. Bonnie's daughter, Ada, testified that Bonnie wanted to move back to Wichita but that Dixon threatened to kill her if she took baby Anna away. In August, Bonnie obtained a restraining order against Dixon and was granted temporary custody of Anna. In September, Bonnie came home with a black eye and told Ada that Dixon took her from a nightclub at knifepoint and demanded to know where Anna was. Bonnie reported this incident to the police.

In October, Bonnie and the children finally returned to Wichita. Bonnie shortly began to date Eddie McIntosh. Dixon continued to provide monetary support and visit on weekends.

On November 11, 1989, Dixon visited the children at Bonnie's apartment. Dixon questioned Bonnie about a boyfriend, but she refused to answer. Dixon left around 10:45 p.m. and spent the night at a hotel. Bonnie left the children with 15-year-old Ada and spent the night with McIntosh.

On Sunday morning, Dixon returned to Bonnie's apartment. He demanded to see Bonnie but Ada refused to tell him where she was, fearful of his prior threats to kill Bonnie if she had a boyfriend. Dixon threatened Ada that something bad would happen if she did not help him. Therefore, she directed him to McIntosh's apartment.

When they arrived, Ada ran to the door and warned Bonnie not to open it. Dixon retrieved a tire iron from the trunk of his car and slashed the tires on Bonnie's car. He pried open the door to McIntosh's apartment and Ada ran inside.

Dixon and McIntosh confronted each other in the parking lot. Dixon asked McIntosh if he had feelings for Bonnie and if he wanted to see her blood. He also said he had an appointment with Bonnie and would be back after he got a weapon.

Ada returned with Dixon to Bonnie's apartment and then left to take a cousin home and get breakfast. Dixon was gone when she returned. Stephanie, however, was upset and crying because she heard Dixon call someone and ask for a shotgun and state he would pay $100 for it. Dixon told Stephanie he was going bird hunting.

Dixon called Bonnie's apartment twice that afternoon. Around 6:00 p.m., while Bonnie was preparing dinner for the family, Dixon arrived at the residence. Stephanie answered the door and tried to shut Dixon out when she saw he carried a shotgun; however, Dixon was able to force his way into the apartment. He walked directly to the kitchen. Bonnie begged him not to shoot, but he shot her three times in the legs and calmly walked away from the apartment.

Dixon drove directly to McIntosh's apartment complex, seeking revenge for the problems he believed McIntosh caused. He went to his sister-in-law's apartment in the same complex and learned that McIntosh was across the street at the laundry. McIntosh and other witnesses testified that Dixon drove directly to the laundry where McIntosh was sitting in his car with another male. These

witnesses state that Dixon got out of his car, reached into the back seat, and then opened fire on McIntosh's car. McIntosh and the other man crawled out of their car and McIntosh returned the gunfire with a revolver he had under the front seat. McIntosh testified he obtained the revolver that afternoon because he took Dixon's threats seriously; however, he waited to shoot until he heard Dixon fire twice with the shotgun. McIntosh sustained gunshot wounds to his right elbow and right side.

Bonnie was rushed to the hospital where amputation of both her legs was performed as a lifesaving attempt. The shock proved too great for Bonnie, however, and she experienced heart failure. She died of hemorrhagic shock, secondary to multiple shotgun wounds of the thighs.

At trial, Dixon presented a very different picture. He testified that he was happy living with Bonnie until she began associating with alcoholics and drug users. At that point, he threatened to divorce Bonnie if she did not stop taking the children around those people. After he was served with a restraining order, he filed for divorce and custody of Anna.

Dixon testified that in September 1989, he flagged Bonnie down in her car on a road in Lawrence. A man got out of Bonnie's car, whom he later recognized as McIntosh, and walked toward him with a gun. Dixon left in his car and reported the incident to the police. He denies any confrontation with Bonnie that resulted in kidnapping or bruising her.

Dixon also testified that Ada was upset with Bonnie on November 12, 1989, because she had been grounded, and Ada offered to take him to McIntosh's apartment. Dixon was upset because Bonnie left the children alone all night and felt Anna and the other children were not well cared for. Dixon stated that Ada was angry and kicked and knocked at the door but no one would let her in. This conduct angered Dixon, and he slashed Bonnie's tires. When he pried open the apartment door, two men came at him with drawn guns, and he recognized McIntosh as the man who had pulled a gun on him in Lawrence. In the parking lot, Dixon told McIntosh he wanted to speak with Bonnie, but when he saw McIntosh reach for a gun he took Ada and left.

Dixon testified he retrieved a shotgun from Bonnie's apartment to protect himself from McIntosh. Dixon left for several hours

and later called Bonnie's apartment to speak with her. Some time in the afternoon, he loaded the shotgun. When Dixon learned Bonnie was home, he went to her apartment; however, he did not see her car outside and was afraid McIntosh might be inside so he took the shotgun with him. Once inside, Dixon asked Bonnie what was wrong and why she had left the children alone. She told him to stay out of her business. Dixon stated he "just lost it" then and shot Bonnie, although he did not mean to hurt or kill her.

The next thing Dixon remembered was driving to McIntosh's apartment seeking revenge. However, Dixon stated he cooled off and went to his sister-in-law's apartment to talk. While there, he learned McIntosh was at the laundry and decided to confront him. However, when he got out of the car and called McIntosh's name, someone fired a gunshot at him. Dixon knelt and grabbed the shotgun. He claims he fired in self-defense.

Dixon was arrested and charged with first-degree premeditated murder of Bonnie Dixon, aggravated burglary, and attempted first-degree murder of Eddie McIntosh. Following a lengthy jury trial, he was convicted as charged and sentenced. Dixon raises numerous issues on appeal.

## I

### Jury Instructions

Dixon contends the trial court erred in refusing to instruct the jury on the lesser degrees of homicide and on aggravated battery as lesser included offenses of attempted first-degree murder.

The general rules on the duty to instruct on lesser included offenses are well established. A trial court has the affirmative duty to instruct the jury on all lesser included offenses established by the evidence. K.S.A. 21-3107(3); *State v. Hill*, 242 Kan. 68, 73, 744 P.2d 1228 (1987). Instructions on lesser included offenses must be given even though the evidence is weak and inconclusive and consists solely of the testimony of the defendant. *State v. Cummings*, 242 Kan. 84, 91, 744 P.2d 858 (1987). An instruction on a lesser included offense is not required, however, if the evidence at trial excludes a theory of guilt on the lesser offense. *State v. Sullivan & Sullivan*, 224 Kan. 110, 120, 578 P.2d 1108 (1978). The duty of the trial court to instruct on the lesser in-

cluded offense is applicable only when the evidence introduced at the trial is such that the defendant might reasonably have been convicted of the lesser offense. *State v. Armstrong,* 240 Kan. 446, 459, 731 P.2d 249, *cert. denied* 482 U.S. 929 (1987). When the trial court refuses to give an instruction on a lesser included offense, the appellate court must view the evidence supporting the lesser charge in the light most favorable to the party requesting the instruction. See *State v. Hunter,* 241 Kan. 629, 644, 740 P.2d 559 (1987).

First, Dixon alleges error in the trial court's refusal to instruct on attempted second-degree murder. Second-degree murder, K.S.A. 21-3402, is clearly a lesser included offense of first-degree murder, K.S.A. 1989 Supp. 21-3401. *State v. Armstrong,* 240 Kan. at 459. All the elements of second-degree murder are included in the elements of first-degree murder, which includes the additional element of premeditation. *State v. Arney,* 218 Kan. 369, 375, 544 P.2d 334 (1975).

Dixon argues the trial court forced the jury to choose between attempted first-degree murder and self-defense without allowing it to consider whether the act was premeditated.

The evidence presented at trial indicates Dixon either acted in self-defense or premeditated the shooting of McIntosh. Dixon claims he had no desire to injure McIntosh but wanted to confront him about the situation which had developed concerning Bonnie. He testified that he shot at McIntosh only after McIntosh fired several times at him. McIntosh testified that Dixon drove directly to the laundry parking lot, pulled a shotgun from the back seat of his car, and opened fire on McIntosh. There is additional evidence that Dixon drove to McIntosh's apartment seeking revenge.

Under the facts of this case, there is no evidence to support a theory of second-degree murder. Thus, where the evidence to support a conviction on the lesser included offense of attempted second-degree murder is lacking, we find no error in refusing to give such instruction. *State v. Hammon,* 245 Kan. 450, 454, 781 P.2d 1063 (1989); *State v. Hoy,* 199 Kan. 340, 345, 430 P.2d 275 (1967).

Next, we examine Dixon's argument that the trial court erred in refusing to instruct on the lesser included offense of attempted

voluntary manslaughter, K.S.A. 1989 Supp. 21-3301(a); K.S.A. 21-3403. Voluntary manslaughter is defined as the unlawful killing of a human being, without malice, which is done intentionally upon a sudden quarrel or in the heat of passion. K.S.A. 21-3403.

Dixon's assertion that there is evidence of a nonverbal quarrel or exchange of hostilities at the laundry parking lot sufficient to require an instruction on attempted voluntary manslaughter is without merit. We find no evidence in the record upon which the jury could reasonably convict Dixon of the lesser offense. No evidence of a quarrel in the parking lot was presented, and evidence of a quarrel between McIntosh and Dixon earlier in the day was too remote in time to support an allegation of provocation. See *State v. Cates,* 223 Kan. 724, 729, 576 P.2d 657 (1978). In addition, Dixon himself alleged the shooting was unintentional and committed in self-defense.

Dixon's third argument is that the trial court abused its discretion in refusing to instruct on aggravated battery. K.S.A. 21-3414 provides, in part: "Aggravated battery is the unlawful touching or application of force to the person of another with intent to injure that person or another . . . ."

In *State v. Daniels,* 223 Kan. 266, 573 P.2d 607 (1977), this court explicitly examined and compared the statutory elements of attempted first-degree murder and aggravated battery. We held that aggravated battery was not a lesser included offense of attempted first-degree murder because an element of the former offense, unlawful touching or application of force to the person of another, was not a necessary element of the latter offense. 223 Kan. at 270.

Since the decision in *Daniels,* however, we have adopted a two-prong test to determine whether a particular offense is a lesser included offense which requires a jury instruction thereon. *State v. Adams,* 242 Kan. 20, 744 P.2d 833 (1987). First, the court must determine whether all the statutory elements of the alleged lesser included offense are required to prove the greater crime charged. 242 Kan. at 23. A jury instruction on a particular lesser offense is required whenever all of its statutory elements will be proved if the State establishes the elements of the crime charged. *State v. Fike,* 243 Kan. 365, 368, 757 P.2d 724 (1988). This "identity of elements" test was applied in *Daniels* and re-

sulted in a finding that aggravated battery, with its additional element, was not a lesser included offense of attempted first-degree murder.

If a comparison of the lesser offense and greater offense fails to disclose an "identity of elements," the court must apply the second prong of the test. This analysis requires the trial court to examine the crime charged and determine if proof of the crime charged also proves a lesser crime. If so, an instruction on the lesser crime is required. *State v. Fike*, 243 Kan. at 368.

In the instant case, count three of the information alleged:

"CAIN DIXON, JR. did then and there unlawfully, willfully, towards the perpetration of the crime of First Degree Murder, as defined by K.S.A. 21-3401, commit the following overt act, to-wit: *shot at* Eddie C. McIntosh with a shotgun, with the intention to commit said crime, and the said CAIN DIXON, JR. failed, was prevented or intercepted in executing said crime by officers of the Wichita Police Department." (Emphasis added.)

Dixon contends the information, read in the light of the facts adduced at trial, establishes that McIntosh was actually shot. Thus, argues Dixon, the State necessarily proved the elements of aggravated battery in establishing the elements of attempted first-degree murder.

Dixon's argument misinterprets the second prong of the test to determine whether an offense is a lesser included offense of a particular crime charged. Under the two-part analysis set forth in *Adams* and *Fike*, a lesser crime may become a lesser included offense of a greater offense if the information actually alleges a lesser crime and the evidence which *must* be established to prove the crime charged also proves the lesser crime. In this case it was not necessary to prove McIntosh was actually shot to establish the elements of attempted first-degree murder. The State was required to prove only that Dixon committed an overt act towards the perpetration of first-degree murder.

Dixon's argument fails to distinguish between what the State may prove and what the State is required to prove. *State v. Gibson*, 246 Kan. 298, 300, 787 P.2d 1176 (1990). The information does not allege unlawful touching or application of force to the person of another and the State was not required to adduce such evidence at trial to prove attempted first-degree murder. Therefore, aggravated battery is not a lesser included offense under

the facts of this case, and we find no error in the trial court's refusal to give an instruction thereon.

Additionally, although Dixon did not request an instruction on aggravated assault, K.S.A. 21-3410, we find no error in the trial court's failure to so instruct. A necessary element of assault requires proof that the victim experienced immediate apprehension of bodily harm. K.S.A. 21-3408; *State v. Warbritton,* 215 Kan. 534, 537, 527 P.2d 1050 (1974).

Immediate apprehension of bodily harm is not a necessary element of attempted first-degree murder. We also find that the information filed against Dixon did not allege immediate apprehension of bodily harm and such proof was not required to prove the greater offense of attempted first-degree murder. Thus, there was no abuse of discretion in failing to provide this jury instruction.

Finally, Dixon contends the trial court erred in refusing to instruct the jury on the lesser included offense of involuntary manslaughter, K.S.A. 21-3404, for the killing of Bonnie. The jury was instructed on first-degree murder, K.S.A. 1989 Supp. 21-3401; second-degree murder, K.S.A. 21-3402; and voluntary manslaughter, K.S.A. 21-3403.

Where a defendant is charged with first-degree murder, involuntary manslaughter is considered a lesser included offense. *State v. Franklin,* 221 Kan. 739, 743, 561 P.2d 860 (1977). The trial court had a duty to instruct on the lesser crime if there was any substantial evidence tending to prove the lesser crime. *State v. Cummings,* 242 Kan. 84, 91, 744 P.2d 858 (1987).

The issue presented, therefore, is whether there was sufficient evidence of the commission of involuntary manslaughter presented at trial to require an instruction on the lesser included offense.

K.S.A. 21-3404(a) provides:

"Involuntary manslaughter is the unlawful killing of a human being, without malice, which is done unintentionally in the wanton commission of an unlawful act not amounting to felony, or in the commission of a lawful act in an unlawful or wanton manner."

Dixon's theory of defense at trial was that he became so upset with Bonnie for leaving the children alone and for improperly caring for them that he lost his wits and shot her with no intent

to harm or kill her. He argues on appeal that an instruction on involuntary manslaughter was warranted because discharge of a firearm in the city violated a Wichita city ordinance and thereby constituted commission of an unlawful act in a wanton manner.

In *State v. Cates*, 223 Kan. 724, 576 P.2d 657 (1978), the defendant raised the very argument which Dixon presents. This court found that violation of a city ordinance was not a theory of defense raised at trial, and judicial notice of the ordinance was not requested. Thus, the court refused to find the defendant guilty of an unlawful act by violation of a city ordinance. 223 Kan. at 728.

In the case at hand, Dixon submitted a proposed jury instruction for involuntary manslaughter based upon the unlawful discharge of a firearm in the city of Wichita. In light of Dixon's proposed jury instruction, we find the trial court had notice of a possible city ordinance violation and sufficient evidence of the unlawful act was presented.

However, before an instruction on involuntary manslaughter is required, the defendant must also present evidence the killing was unintentional. Did Dixon provide sufficient evidence the killing was unintentional to support an involuntary manslaughter instruction? We think not.

The sole evidence that Bonnie's killing was unintentional was Dixon's testimony that he did not intend to harm or kill Bonnie, but "lost it" once he entered her apartment. We considered a similar case in *State v. Staab*, 230 Kan. 329, 635 P.2d 257 (1981).

In *Staab*, the defendant shot and killed his ex-lover's new husband. On the evening following the victim's wedding, the defendant drove home to retrieve a gun, walked to the newlyweds' home, forced his way into their house, and while being ushered out shot the victim three times. The defendant walked to his pickup and calmly drove home, where he called his ex-lover and gloated that he had done what he had said he would do. 230 Kan. at 332-33.

At trial, the defendant claimed the victim reached across his body for something and defendant shot in self-defense. We found the defendant's testimony that he did not intend to kill was the only evidence of an unintentional killing. We found defendant's statement, considered in light of all the other evidence, insub-

stantial and insufficient to support a theory of an unintentional killing. Thus, there was no duty to instruct on the lesser offense of involuntary manslaughter. 230 Kan. at 340.

In this case, the evidence reveals Dixon made threats to kill his estranged wife if she had a boyfriend, confronted Bonnie and McIntosh in a violent manner, and according to Dixon retrieved a shotgun from Bonnie's home on the very day of her killing. In addition, Dixon spent several hours "thinking" and loaded the shotgun after learning Bonnie was home. He forced his way into Bonnie's apartment and shot three times an unarmed victim who pled for her life. Finally, Dixon calmly walked from the apartment and drove directly to McIntosh's apartment complex. In light of the overwhelming evidence presented at trial, we find Dixon's sole statement denying intent to kill or harm Bonnie insufficient to support a finding of involuntary manslaughter. Thus, the trial court did not err in refusing to give the requested jury instruction.

## II
### Evidence

Dixon's next argument on appeal is that the trial court erred in allowing the State to conduct an evidentiary demonstration during cross-examination of the defendant. During the prosecutor's cross-examination of Dixon, she simulated inserting a round into the chamber of the shotgun, pointed the shutgun in the general direction of Dixon, and pulled the trigger. Dixon's numerous objections were overruled and his motion for mistrial based on the State's demonstrative use of the shotgun was denied.

The State contends its actions were not prejudicial or utilized to inflame the jury and intimidate the defendant. The State argues it merely attempted to refute Dixon's testimony that he did not have a specific intent to kill Bonnie by demonstrating that a pump-action gun could not have been successively fired without conscious effort.

The allowance of demonstrations or tests, to be performed in the presence of the jury, rests in the sound discretion of the trial court, and exercise of that discretion will not be overturned on appeal unless an abuse of discretion is apparent. *State v. Costa,* 228 Kan. 308, 319, 613 P.2d 1359 (1980); *Timsah v. General Motors Corp.,* 225 Kan. 305, 317, 591 P.2d 154 (1979). A dem-

onstration's propriety, probative value, and assistance to the trier of fact are determinations properly left to the trial court. *State v. Morton*, 217 Kan. 642, 644, 538 P.2d 675 (1975). Generally, tests and experiments are admissible which reveal the ballistics of a weapon, the manner and ease of firing a gun, and the distance from a gun to a victim when the gun was fired. *Malone v. New York Life Ins. Co.*, 148 Kan. 555, 560, 83 P.2d 639 (1938); 29 Am. Jur. 2d, Evidence § 827.

In the present case, we do not commend the State's tactics but we cannot find the trial court's ruling an abuse of discretion. Dixon testified on direct examination that he did not intend to hurt or kill Bonnie. The State through the use of demonstrative evidence and a visual aid attacked Dixon's credibility and attempted to refute the testimony that specific intent was lacking when Dixon shot and killed his wife. The issue of intent was material to the case and, therefore, we find no abuse of discretion in allowing the State to demonstrate the mechanical operation of the shotgun to establish intent.

## III
### Jury

For his final argument, Dixon contends he was denied a trial by an impartial jury. He alleges the trial court erred in denying challenges for cause of three prospective jurors.

K.S.A. 22-3410 sets forth specific grounds upon which a party may challenge a prospective juror. Dixon relies upon K.S.A. 22-3410(2), which provides:

"A juror may be challenged for cause on any of the following grounds:

. . . .

"(i) His state of mind with reference to the case or any of the parties is such that the court determines there is doubt that he can act impartially and without prejudice to the substantial rights of any party."

Challenges for cause are tried to the district court and decided in its discretion. *State v. Case*, 228 Kan. 733, 737, 620 P.2d 821 (1980). We have consistently held that the trial court is in a better position than this court to view the demeanor of prospective jurors as they are questioned. *State v. Mahkuk*, 220 Kan. 74, 76, 551 P.2d 869 (1976); *State v. Carpenter*, 215 Kan. 573, 577, 527 P.2d 1333 (1974). Thus, the trial court's ruling on

a challenge for cause will not be disturbed unless it is clearly erroneous or an abuse of discretion is shown. *State v. Sanders,* 223 Kan. 273, 274, 574 P.2d 559 (1977).

Dixon first contends the trial court abused its discretion in refusing to sustain a challenge for cause of Ms. Slaymaker. Ms. Slaymaker stated she might have trouble being impartial in light of evidence of a prior similar crime. Ms. Slaymaker also stated during voir dire that she might give more credibility to the children's testimony when compared to the defendant's.

Dixon's argument of abuse has no merit. Ms. Slaymaker was removed from the venire panel by peremptory challenge and did not serve as a juror. When a prospective juror is removed from the jury panel by peremptory challenge, her qualifications are no longer a controlling factor, and where the defendant is not prejudiced the trial court's denial of a challenge of that juror for cause is not ground for reversal. *State v. Sagebiel,* 206 Kan. 482, 484, 480 P.2d 44 (1971).

Dixon next argues the trial erred in failing to dismiss Mr. Hurst. Mr. Hurst previously worked in the same law firm as had the district attorney and felt uncomfortable because the firm had supported the district attorney in the past election. Mr. Hurst stated the relationship would be a conscious factor in his deliberations but felt it would not affect his ability to make a fair judgment. Mr. Hurst also stated he might give more credibility to a child's testimony than to defendant's, but also noted that belief was not absolute and would depend on the individual's testimony.

In *State v. Taylor,* 225 Kan. 788, 594 P.2d 211 (1979), we considered the appropriateness of a trial court's refusal to strike two veniremen for cause who had worked in the district attorney's campaign. The prospective jurors were closely examined and each declared his belief he could act as an impartial juror. We found there was no evidence of bias or prejudice and held the trial court did not abuse its discretion. 225 Kan. at 794.

In the present case, Mr. Hurst was subjected to extensive voir dire. He declared his ability to find the defendant not guilty if the State failed to prove all elements of the crimes charged and stated his prior relationship with the district attorney would not affect his ability to be a fair and impartial juror. Mr. Hurst's

statement that he might give more credibility to a child's testi-. mony was tempered by his declaration that this was not absolute and depended upon the individuals and testimony presented. This court has stated that a juror whose opinion or impression is contingent on the truth or falsity of the information presented and who is free to consider the evidence without regard to a former impression is a competent juror. *State v. Sagebiel,* 206 Kan. at 485; *State v. Stewart,* 85 Kan. 404, 410, 116 Pac. 489 (1911).

We find no evidence of prejudice by Mr. Hurst and find the trial court did not abuse its discretion in refusing to strike him from the jury panel.

Finally, we consider Dixon's allegation of error in the trial court's refusal to strike Mrs. Moore for cause. Mrs. Moore's husband had recently sat as a juror on a case where one spouse killed the other in front of a child who later committed suicide. Because of the similarity between the cases, Mrs. Moore found it might be difficult for her to be a fair and impartial juror. Mrs. Moore also stated it would be difficult to remain unsympathetic to the victim. In light of the evidence of a past crime, Mrs. Moore believed it would be difficult to presume Dixon's innocence. This information, coupled with the knowledge from the case on which her husband had served, led Mrs. Moore to conclude she might be an unfair and partial juror. Mrs. Moore had also learned from friends at the hospital that Bonnie Dixon was shot in front of her children. Mrs. Moore stated that this fact alone would not cause her to vote guilty but recognized that she did hold deep feelings on the matter.

Examination of the record clearly indicates Mrs. Moore did not desire to sit as a juror in the present case. She repeatedly told the court she would have trouble sitting as a fair and impartial juror. In denying the challenge for cause, the trial court stated, without explanation, that Mrs. Moore was a panelist who should be stricken by a peremptory challenge but not for cause.

We believe the trial court's use of its discretion in refusing to excuse Mrs. Moore for cause is questionable but does not rise to the level of abuse. It would have been safer to excuse Mrs. Moore from the panel, but the defendant could have removed Mrs. Moore by peremptory challenge, which he did not do. The

record does not indicate why the defendant failed to utilize a peremptory challenge as suggested by the trial court to strike Mrs. Moore from the panel. Dixon makes no argument that use of a peremptory challenge on Mrs. Moore would have forced him to accept other objectionable jurors. See *State v. Mayberry*, 248 Kan. 369, 807 P.2d 86 (1991). Under these circumstances, we find no reversible error in the trial court's ruling.

The judgment of the district court is affirmed.